233 N.J. Super. 65 (1989)
558 A.2d 28
C.B. SNYDER REALTY INC., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
BMW OF NORTH AMERICA INC. AND JOSEPH R. SUTHERLAND, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1988.
Decided May 5, 1989.
*67 Before Judges LONG, MUIR, Jr. and KEEFE.
Michael S. Meisel argued the cause for the appellants (Cole, Schotz, Bernstein, Meisel & Forman, attorneys; Faith S. Hochberg and Michael D. Sirota, on the brief; Michael S. Meisel, of counsel and on the brief).
Howard Stern argued the cause for the respondent (Stern, Steiger, Croland, Tanenbaum & Schielke, P.A., attorneys; Howard Stern, of counsel; David J. Klein, on the brief).
The opinion of the court was delivered by KEEFE, J.S.C. t/a
After a bench trial plaintiff, C.B. Snyder Realty, Inc., was determined to have been the "efficient producing cause" of two separate lease transactions executed on separate dates with defendant BMW of North America, the lessee of each property.[1] *68 The trial judge also found that defendants, BMW and Joseph R. Sutherland, tortiously interfered with plaintiff's opportunity to receive a commission from the lessor of each property. Consequently, damages were awarded to plaintiff in the amount of $159,027.00 on the first transaction (Grand Met) and $45,000.00 on the second transaction (Atrium). As to a third transaction, wherein BMW purchased 41.6 acres of land from Ingersoll-Rand, the trial judge found plaintiff was not the efficient producing cause of the sale but awarded damages to plaintiff, nonetheless, in the amount of $2,500.00, for the "reasonable value of its services regarding the Ingersoll-Rand acreage." Finally, although defendants were found liable for an intentional tort (interference with prospective economic advantage), the trial judge, finding that defendants' conduct was not "sufficiently egregious," declined to award punitive damages.
Defendants appeal challenging the judgment in all respects, except the trial judge's finding that plaintiff was not the efficient producing cause of the Ingersoll-Rand sale. Plaintiff cross-appeals challenging the denial of punitive damages, the measurement of damages concerning the Atrium lease, and the determination that plaintiff was not the efficient producing cause of the Ingersoll-Rand sale. We conclude that defendants did not tortiously interfere with plaintiff's prospective economic advantage. Further, although we agree with the trial judge that plaintiff was not the efficient producing cause of the Ingersoll-Rand transaction, we hold that there is no legal basis to award damages for services rendered by plaintiff in connection with that transaction. Thus, the judgment under review is reversed.
*69 An appellate court is bound by the trial judge's determination of credibility and those findings of fact which are reasonably supported by the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974). However, where the focus of the dispute is not on credibility but, rather, alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom the appellate function broadens somewhat. Where our review of the record "leaves us with the definite conviction that the judge went so wide of the mark that a mistake must have been made," we may "appraise the record as if we were deciding the matter at inception and make our own findings and conclusions." Pioneer National Title Insurance Co. v. Lucas, 155 N.J. Super. 332, 338 (App.Div. 1978). While we have accepted the trial judge's credibility determinations, we have expanded on the findings of fact and evaluated the facts differently in several respects. Those differences will become apparent in the following discussion.
Plaintiff, C.B. Snyder Realty, Inc., specializes in industrial office real estate. John DeCarlo was a salesperson-broker associated with plaintiff. DeCarlo's first contact with BMW was in 1983 when he was acting as the exclusive agent for a tenant in a warehouse who was seeking to sublease it. DeCarlo was contacted by an agent of BMW and, after some negotiation, the transaction was concluded and a commission paid. DeCarlo was also a personal acquaintance of Terrence Cronin, the regional manager for BMW's Eastern Region. De Carlo had perhaps six or seven conversations with Cronin in 1983-84 concerning DeCarlo's desire to be of "assistance or service" to BMW should it have any real estate needs. Cronin advised DeCarlo that BMW would be looking to relocate the Eastern Region office and would need between ten and twenty thousand square feet of space. He advised DeCarlo that defendant Joseph Sutherland, an employee of defendant, was the person who would handle the real estate needs for BMW in that regard. Cronin thereafter suggested that Sutherland telephone DeCarlo concerning the specific project. Sutherland called DeCarlo *70 and a meeting was established for July 31, 1984. The meeting was attended by DeCarlo, Cronin and Sutherland. Two topics were discussed at that meeting: 1) the requirements for the Eastern Region Headquarters of approximately 15,500 square feet, part of it being office space and the other part a training facility for mechanics; and 2) a site for the new corporate headquarters. Sutherland further specified that the ceiling in the space for the training facility would have to be at least 20 feet high to accommodate a hydraulic lift. DeCarlo understood that plaintiff would have to look to the lessor or seller, as the case may be, for a commission and that BMW desired not to have its identity revealed to any prospective lessor until the transaction was about to be consummated.
After the meeting DeCarlo teamed up with Bernard Prober, another salesperson-broker associated with plaintiff, in preparing a list of available sites. The list, dated August 20, 1984, contained 30 separate sites which DeCarlo felt met defendant's specifications. The Atrium property, but not the Grand Met, appeared on that list. An appointment was made with Sutherland to take him to those various sites on August 21, 1984. Sutherland was not advised in advance what properties he would see and was given the list only when the tour was completed.
The August 21st tour apparently consisted of merely looking at the listed properties from the outside. Sutherland's arrangement with DeCarlo was that if Sutherland was interested in a property from its physical appearance and the basic information made available to him during the tour, DeCarlo and/or Prober would obtain more detailed information in preparation for an inside inspection. When the Atrium was viewed on August 21st, it was apparent to Sutherland that it was under construction. DeCarlo understood that there was some urgency in BMW's quest for new Eastern Region Headquarters since the lease on its current headquarters was to expire in 30 to 60 days. Between August 21 and August 23, 1984, plaintiff's agents learned that the Atrium construction was not scheduled to be *71 completed and ready for occupancy for another seven to nine months. Based on that information and recognizing his employer's urgent need to find suitable premises, Sutherland rejected the Atrium as a desired site.
There was a conflict in the testimony between DeCarlo and Prober concerning when Sutherland was first shown the Grant Met site. Prober's testimony was that it was shown on August 21st during the first tour and for the purpose of fulfilling BMW's needs for a regional headquarters. DeCarlo testified that it was shown during a tour on August 24th and only because Sutherland had, sometime between August 21st and 24th, expressed a need for some additional office space consisting of 21 to 25 thousand square feet to house the marketing, marine and motorcycle divisions. The trial judge found that the Grand Met was shown to Sutherland for the first time on August 21st thereby accepting Prober's version. Prober's version coincided with Sutherland's recollection that it was shown to him from the parking lot on the first tour on the 21st and in connection with BMW's requirements for the Eastern Regional Headquarters. The trial judge also found that Sutherland quickly informed plaintiff's representatives that he was familiar with the structure and that its dimensions were such that a lift could not be installed. The evidence reflected that Sutherland's daughter had worked for the building manager, Mr. Lavera, and that Lavera had shown Sutherland the building at some earlier time when Sutherland was having lunch with his daughter. Both DeCarlo and Prober testified that the Grand Met was shown to Sutherland only on two occasions and both agreed that the second occasion was on September 25, 1984. Therefore, DeCarlo's testimony that he showed the property to Sutherland on August 24th and the reason he claimed for showing it was impliedly rejected by the trial court.
A second tour of properties occurred on August 24, 1984. Except as to the dispute over whether the Grand Met was seen on that date, the trial judge made no specific findings as to what properties were viewed. However, a second list dated *72 August 28, 1984 shows an addition of four sites to the first list as well as additional information concerning the Atrium. The Grand Met was not one of the added properties.
Sutherland testified that he did not advise DeCarlo of the need for 21 to 25 thousand square feet of office space to house the marketing, marine and motorcycle divisions until, "[w]e had dropped the need for the space for the Eastern Region." It is clear that BMW's needs changed after it successfully renegotiated an extension of its lease for the regional headquarters building. The trial judge was correct in observing that no specific date was given for when the lease was renegotiated. However, the record is clear that DeCarlo was aware of BMW's changed needs prior to the third tour of property on September 25, 1984, although he may not have told Prober of those changed needs. Again, Sutherland was not told what properties would be viewed beforehand. The following excerpt from DeCarlo's testimony concerning that third tour is revealing.
Q. So you recall that time that you told Mr. Prober that BMW's requirements had changed  this is on September 25, 1984, and the current need was for just office space?
A. That's correct, because Mr. Prober was trying to show on the Grand Met plans how part of the building could be used where a lift could be utilized because there was an atrium in that building. I told Mr. Prober their needs changed, looking for pure office. The need for the lift was no longer there and had an immediate need for office space.
* * * * * * * *
Q. You also drove him to the parking lot at 100 Paragon Drive in Montvale known as the Grand Met Building. Is that correct?
A. That's correct, that was the second time we took him to that building.
This testimony established without doubt that the second visit to the Grand Met was the first time plaintiff's agents discussed its suitability for BMW's changed needs with Sutherland.
The trial judge found: "[T]here is no indication that Sutherland, having told De Carlo and Prober in August, 1984, that BMW was not interested in the Atrium as an Eastern regional building because it would not be completed in time, subsequently *73 disclosed to the [plaintiff's] representatives that its need was no longer immediate and urgent." However, DeCarlo's testimony in our view establishes quite clearly that he was aware that BMW's needs had changed by at least September 25, 1984, and that the search was for pure office space. The discussion on September 25th again took place in the parking lot of the Grand Met. Plaintiff's representatives gave Sutherland a set of floor plans for the building. However, Sutherland refused to get out of the vehicle and enter the building because he knew, although he didn't tell DeCarlo or Prober, that his boss, Carl Hammermueller, had previously made an appointment with Randy Eigen of Keller Associates to visit the building that very afternoon for the purpose of discussing a lease to satisfy defendant's changed needs.
Keller Associates was the exclusive broker for the Grand Met. Its sign was posted on the property and extensive efforts were being made by Keller to lease the available space. Keller solicited the aid of other brokers, including plaintiff, to assist in that regard. Hammermueller testified, and it was undisputed, that Eigen contacted Hammermueller some time earlier for the purpose of discussing office space with him. Hammermueller was aware that the Grand Met had not been listed by plaintiff on either of the lists that had been given to Sutherland and felt free to make an appointment with Eigen to see the premises. However, by the time the inspection took place in the afternoon of September 25th, Sutherland had told Hammermueller that he had been taken to the premises by plaintiff's agent but had refused to enter the building.
Although Sutherland refused to discuss the Grand Met property with plaintiff's agents on September 25th, he did express an interest in a property known as Montvale Center and DeCarlo delivered the plans for that premises to Sutherland on the 28th. Soon thereafter, at Sutherland's request, he was taken through that building by DeCarlo and the owners. As a result, DeCarlo obtained a commission agreement from the owner of the Montvale Center Building. Sutherland told DeCarlo that he *74 would present the property to the BMW Board for its review at a meeting scheduled for October 6, 1984. On October 8, 1984, Sutherland told DeCarlo that no decision had yet been made. Later, on October 19, 1984, Sutherland told DeCarlo that BMW was beginning negotiations on the Grand Met Building through Randy Eigen of Keller Associates.
Plaintiff advised defendants that it would claim a commission because it felt that it was the procuring cause of any lease to be signed concerning the Grand Met. Keller Associates was advised of plaintiff's claim. A meeting between representatives of the plaintiff and representatives of Keller Associates took place during which plaintiff attempted to be recognized for a commission. Plaintiff's claim was rejected. When plaintiff asked defendants to intervene on its behalf, Sutherland advised DeCarlo that plaintiff would have to work out its commission problems with Keller because BMW did not want to get involved in the middle of a commission battle. Efforts to resolve the dispute failed and by November, 1984 DeCarlo characterized relations with BMW as "broken off completely." On the subject of the viability of any future relationship between plaintiff and BMW DeCarlo testified:
Q. Was there any possibility of continuing your efforts with respect to the Atrium?
A. No, there wasn't.
Q. Or indeed was there any possibility of continuing your efforts with respect to any other piece of property to which you had introduced Mr. Sutherland?
A. No, there wasn't.
William Caver became BMW's corporate property manager on July 22, 1985 and transferred from California to New Jersey for that purpose. He said that BMW renewed its search for appropriate headquarters for the Eastern Region in the fall of 1985 and that he assumed the responsibility for that search. In that respect he contacted Greg Hoffman of the McBride Agency who showed him "approximately a dozen" sites, one of which was the Atrium for which McBride was the exclusive broker. A lease for the Atrium was executed on December 4, 1985. *75 The lessor paid a full commission to McBride. However, before the lease was executed Caver learned through BMW's legal department that Sutherland had been shown the property by plaintiff's representatives. Both McBride and the lessor were advised of that fact. On the same date that the lease was signed the lessor acknowledged BMW's disclosure and agreed to indemnify BMW against any claim for damages, except punitive damages, arising from plaintiff's claim for a commission.
The third transaction involved in this litigation was the sale of the Ingersoll-Rand property to BMW on September 25, 1987. The property was included in the third list of properties prepared by plaintiff on September 25, 1984 but had been shown to Sutherland at some prior time. The trial judge found that Sutherland had displayed an interest in the property as a possible place for the location of corporate headquarters. Based upon that interest Prober spoke to William Grant of Ingersoll-Rand without disclosing who his client was. Grant explained several ways in which a deal might be structured, including a long term lease of a building to be constructed by Ingersoll-Rand or an outright sale of acreage. However, Grand advised Prober that Ingersoll-Rand required that the details of any transaction be resolved by the chief executive officers of both corporations. Prober passed this information on to Sutherland. Sutherland apparently was unaware of the fact that negotiations for that property had already commenced between Clyde H. Folley, senior vice president and chief financial officer of Ingersoll-Rand, and Horst H. Bodenbinder, executive vice president of BMW. The trial judge found Mr. Folley's testimony to be true concerning the essentials of that transaction. Folley said that as early as 1983 serious negotiations were taking place between the two corporations. The trial judge also found that a series of correspondence between Ingersoll-Rand and BMW commencing on October 27, 1983 and concluding on December 18, 1984 proved that discussions in *76 earnest had commenced and were well underway before plaintiff ever showed the Ingersoll-Rand property to Sutherland.
It has long been established that the right to pursue the real estate business is a property interest which the law protects against unlawful interference. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E & A 1934). In general, in order to succeed on such a cause of action, the broker must prove: 1) unlawful, intentional interference with plaintiff's prospect of, or reasonable expectation of, economic advantage, and 2) a reasonable probability that plaintiff would have received the anticipated economic benefits had there been no interference. Myers v. Arcadio, Inc., 73 N.J. Super. 493, 498 (App. Div. 1962). The first element of proof focuses on the quality of the defendant's conduct, Sustick v. Slatina, 48 N.J. Super. 134, 144 (App. Div. 1957), while the second element focuses on the expectations of the broker stemming from its relationship with the seller or lessor. Myers, supra at 500; Geo. H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159, 168-169 (App. Div. 1957). The second element of proof is not seriously contested on this appeal. Although both the Grand Met owner and the Atrium owner were negotiating for tenants through an exclusive broker, it is reasonably inferable from the evidence that, had the owners believed plaintiff was an efficient producing cause of the respective leases, a commission would have been received by plaintiff. The real focus of this appeal is on the first element of proof, i.e., whether defendants' conduct was actionable.
An understanding of the "relational interest" of the parties is an appropriate starting point in the analysis of defendant's conduct. Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 254-255 (App. Div. 1957). This is so because, "in this field of law, as in so many others, it is impossible to lay down precise rules of liability which will readily solve all cases." Myers, supra at 500. In terms of relational interests it is important to understand that, although BMW engaged the plaintiff to seek out property suitable for BMW's needs, plaintiff *77 understood that BMW would not be paying it a commission even if plaintiff was successful in its endeavors. Rather, plaintiff understood that any commission would be paid by the seller or lessor. Further, there was no agreement that plaintiff was BMW's exclusive agent for these purposes. Thus, defendant was free to utilize other brokers for the same purpose. Cf. McLaughlin v. Weichert Co. Realtors, 218 N.J. Super. 63 (App. Div. 1987). (In a suit between brokers over the commission from the sale of a house, it was not even suggested that the purchasers, who changed realtors after first being shown a house by plaintiff and who were dismissed either before or during trial, could be liable to the plaintiff for tortious interference.) In this instance two of plaintiff's competitors, Keller and McBride, each successfully negotiated on BMW's behalf for space in the Grand Met and Atrium buildings and thus were entitled to, and in fact were paid, full commissions by the owners of those buildings. There is no evidence in this case that defendants realized any financial benefit in terms of reduced rentals or any other economic benefit by maintaining the position it did vis-a-vis plaintiff.
The type of relationship described herein has generated a substantial number of reported cases where the broker has sued on the theory that the client buyer has tortiously interfered with the broker's expectation of being paid a commission by the seller arising from a specific transaction.[2] In every reported case where the broker was successful in obtaining judgment against its buyer client there has been one common factor, i.e., proof that the defendant client enhanced its financial position at the expense of the broker's commission. McCue v. Deppert, 21 N.J. Super. 591 (App. Div. 1952); George H. Beckman Inc. v. Charles H. Reid & Sons, Inc., supra; Sustick v. Slatina, supra.; Myers v. Arcadio, Inc., supra; Harris v. *78 Perl, 41 N.J. 455 (1964); Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173 (App. Div. 1978). However, where a commission has been paid and where there is no evidence that the client has benefited at the expense of the broker, tortious interference has not been found. Weinstein v. Clementsen, 20 N.J. Super. 367 (App. Div. 1952); cf. McLaughlin v. Weichert Co. Realtors, supra.
Plaintiff argues that the absence of proof that defendants benefited financially in any way is irrelevant to its right to recover on the theory of tortious interference. Plaintiff relies upon the following passage from Leslie Blau Co. v. Alfieri, supra. to support its argument:
Unjust enrichment of the tortfeasor is not an element of the tort. But such enrichment is a consideration not alone in connection with whether, as stated, a defendant's conduct was initiated out of sheer malice, but also in determining whether the moral standards have been violated. 157 N.J. Super. at 189.
Plaintiff contends that the ultimate inquiry for a trier of fact is whether defendants' conduct, even where financial gain cannot be proven, was "transgressive of generally accepted standards of common morality or of law." Sustick v. Slatina, supra 48 N.J. Super. at 144.
The quoted passage from the Leslie Blau case must be read in the context of the entire opinion, and, specifically, the passage that preceded it. We held in that case that a plaintiff could recover for tortious interference if there was proof that the defendant acted with the specific motive of depriving plaintiff of a commission, i.e. "sheer malice", or if plaintiff proved that defendant "acted out of a motivation to enhance his financial position  for profit, ...", 157 N.J. Super. at 189, and, in the latter case,
it is necessary for recovery that his conduct must have been transgressive of generally accepted standards of morality, i.e., a violation of standards of `socially acceptable conduct.' (citations omitted). The instant case was submitted to the jury on the thesis that the Alfieri Group sought to profit by their perfidy, so that recovery against them required a finding by the jury that their conduct violated the accepted standards of morality.
The tort is not founded on a quantum meruit or quasi-contract thesis. Unjust enrichment of the tortfeasor is not an element of the tort. But such *79 enrichment is a consideration not alone in connection with whether, as stated, a defendant's conduct was initiated out of sheer malice, but also in determining whether the moral standards have been violated. Ibid.

The trial judge did not find, and indeed there is no evidence of, "sheer malice" on either defendant's part. (Such a finding would be actionable without proof that defendant benefited financially.) Thus, in order for the finder of fact to conclude that defendants' conduct was "transgressive of generally accepted standards of morality," plaintiff was required to prove that defendants acted for the purpose of enhancing their financial position. That type of evidence was totally lacking in this case. In each instance a full commission was paid to a broker, and there is no evidence that either BMW or Sutherland benefited financially by reason of plaintiff's failure to be recognized by the lessors.
In Harris v. Perl, supra, our Supreme Court said:
Of course a broker must accept competition from other brokers. (citations omitted). Frequently, especially when property is listed widely, several brokers will try to interest the same prospect. In such circumstances, a dispute as to who was the procuring cause should be fought out with the owner, and the purchaser should not be burdened with the quarrel in the absence of fraudulent conduct on his part. But if the purchaser beats the broker out of his commission by buying from the owner directly or through a front, thus appropriating to himself the value of the services of the broker, he should pay for that mischief. 41 N.J. at 463. (emphasis added).
This statement by our Supreme Court is applicable to the facts of this case. As noted earlier, BMW was free to engage several brokers in the pursuit of its goals. BMW's engagement of Keller Associates and McBride Agency is simply evidence of the kind of competition from other brokers that the plaintiff by law is required to accept. Plaintiff points to BMW's requirement that plaintiff not disclose BMW's identity to any customer as evidence of its fraudulent conduct. Plaintiff argues that brokers register prospective buyers or lessees with owners because such registration documents the broker's contact and protects the owner from duplicative commission claims. Plaintiff contends that registration is commonly accomplished by notifying the owner by letter of the identity of the customer *80 and the date when the property was shown. Registration of course does not prove that the broker was the efficient procuring cause of the transaction. That determination depends upon many factors. At best registration advises the owner or lessor that, should a transaction be completed with the named customer, a commission will be claimed. The evidence in this case is clear that defendant notified the lessor of the Atrium and of the Grand Met of plaintiff's claimed involvement. That is all that can be expected of a client such as BMW. BMW's communication to the prospective lessors had the same effect as registration. It was for the lessors to determine whether the facts and circumstances under which Sutherland was shown the property warranted the payment of a commission to plaintiff. If the owner and its broker cannot agree on plaintiff's entitlement to a commission, plaintiff's quarrel is with the owner. Thus, the fraud exception of which the Perl court spoke, is not established by that evidence.
Furthermore, while plaintiff is upset that BMW did not take a more active role in securing a commission for plaintiff in the Grand Met transaction, there was no evidence that either BMW or Sutherland misrepresented plaintiff's involvement in the matter. Likewise, in the Atrium transaction, BMW advised the owner and McBride that plaintiff had shown the property to it fifteen months earlier. The trial judge found, as a fact, that BMW did not advise plaintiff that it was closing the transaction on the Atrium. BMW contends that it did not do so because it did not believe that plaintiff was the producing cause of the lease. Whether BMW was legally correct in that analysis is irrelevant to its liability for tortious interference. Whatever duty it had to the plaintiff at that time was discharged by advising the owner of plaintiff's involvement. It was for the owner to recognize or refuse to recognize plaintiff as a broker. Harris v. Perl, Ibid.
We have concluded to this point that defendants cannot be liable for tortious interference (on the facts of this case) and *81 that the question of who the procuring cause of the Grand Met and Atrium leases was should have been fought out with the owner. Nonetheless, it is appropriate to address the trial judge's conclusion that plaintiff was the efficient procuring cause of both transactions. On the Grand Met transaction the trial judge concluded that, although Sutherland was familiar with the property before plaintiff showed it to him, it was plaintiff who convinced Sutherland that the Grant Met was suitable for BMW's changed needs. That conclusion is simply not supported by the facts. An appointment had been made between BMW's agent, Hammermueller, and Keller to see the property in the context of BMW's changed needs before plaintiff's agents took Sutherland to the property on September 25, 1984. Moreover, Sutherland, knowing that the appointment had been made, refused to discuss its suitability and refused to leave the car to view the property more closely.
As to the Atrium transaction, it is clear that plaintiff introduced BMW to the property. However, that does not suffice to establish plaintiff's claim to a commission. In Weinstein v. Clementsen, 20 N.J. Super. 367 (App. Div. 1952) we said:
A broker does not earn his commission by the mere introduction of a buyer to the owner, but he must be the efficient procuring cause of the contract between seller and purchaser. (citation omitted). But where the broker presents a prospective buyer and, on that basis negotiations ensue, even though the broker takes no part in them, and a sale results, then ordinarily the broker is considered to be the efficient cause.
Id. at 372. In that case, defendant Clementsen listed her property with two brokers, plaintiff Weinstein and defendant Bunch, and agreed to pay a commission of 5%. Defendant Nunguesser called Weinstein's office and discussed the property with one of his employees. On the same day Nunguesser was shown the property by Weinstein's employee and was introduced to Clementsen. There were two more contacts between Weinstein's employees and Nunguesser. On the last occasion Nunguesser offered $1000.00 less than the listed price for the property. Weinstein never submitted the offer to *82 Clementsen. Several days later defendant Bunch took Nunguesser to the property. Nunguesser and Clementsen agreed on a purchase price $500.00 less than the listing price and signed a contract of sale. Clementsen informed Bunch that Weinstein had introduced Nunguesser to her as a prospective purchaser. Bunch agreed to save Clementsen harmless from any claim Weinstein might make against her. Clementsen paid the full commission to Bunch. Weinstein sued Clementsen, Bunch and Nunguesser. The theory of his cause of action was that all defendants had "unlawfully interfered with plaintiff's business." The trial court entered judgment in favor of Weinstein against Bunch and Nunguesser but not against Clementsen. On appeal the judgment against Bunch and Nunguesser, was reversed. We found that Bunch was the efficient procuring cause of the contract even though negotiations began between Weinstein, the prospective purchaser and the owner. Furthermore, we found that Nunguesser did not act wrongfully when she left Weinstein and went to Bunch. We said:
The plaintiff's postulate seems to be that the broker who first `finds' a potential customer and aroused his interest in the matter which the broker is promoting, acquires an exclusive right to develop that interest into an actual business transaction. Such is not the American law of free enterprise. One sows and another reaps. One insurance salesman convinces the prospect that more insurance is advisable, and another salesman-and old friend of the prospect-writes the policy. A well-conceived advertisement of one merchant, or an able salesman, also makes the sale but the customer decides to `think it over,' and next day buys the article from a competitor."
20 N.J. Super. at 374. In this case BMW had every right to terminate its relationship with plaintiff after the Grand Met deal. BMW accurately concluded that plaintiff had not earned a commission on the Grand Met transaction and had exhibited conduct unfavorable to an ongoing relationship. Thus, BMW had the same right that Nunguesser had in the Weinstein case, that is, the right to pursue negotiations on the Atrium transaction even though plaintiff had introduced BMW to the property. See also, McLaughlin v. Weichert Co. Realtors, supra. The *83 McBride Agency was clearly the efficient procuring cause of the transaction between BMW and the Atrium.
Finally, the trial judge concluded that plaintiff was not the efficient procuring cause of the Ingersoll-Rand transaction. Plaintiff cross-appeals from that decision challenging the trial judge's findings in that regard. However, the judge's findings of fact are amply supported by the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974). Negotiations were engaged in by top executives of both companies well before plaintiff's salesmen mentioned the property to Sutherland.
Although we agree with the trial judge's conclusion that plaintiff was not the efficient procuring cause of the sale, we find that he erred in awarding quantum meruit damages. The judge said:
I find that it would be decidedly unfair to deny C.B. Snyder the reasonable value of the services of its associates who were caused to work on the matter due to the failure of communication in the BMW chain of command.
It is fundamental that in order for a court to award damages, a wrong must have occurred. See Kozlowski v. Kozlowski, 80 N.J. 378, 388 (1979). The wrong must be either in tort or contract. Because plaintiff was not the efficient procuring cause of the Ingersoll-Rand transaction, BMW had no implied contractual obligation to plaintiff. Rothman Realty Corp. v. Bereck, 73 N.J. 590, 602 (1977). Likewise, for the same reason, it could not possibly have interfered with plaintiff's prospective economic advantage. Harris v. Perl, supra. In the real estate business "[t]he role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds." Harris v. Perl, Id. at 462. (emphasis added). A broker succeeds only if he is the efficient procuring cause of the transaction. That did not occur in this instance and therefore damages cannot be awarded.
The judgment entered in favor of the plaintiff is reversed.
NOTES
[1] The first transaction involved premises known as the Grand Met. BMW actually executed two subleases for those premises. However, the two subleases are considered as one transaction in this opinion for ease of reference. The second transaction involved premises known as the Atrium and consisted of one lease.
[2] It is immaterial herein that the broker's client is either a prospective buyer or lessee, or both as in this case. The legal principles are the same. Likewise, it is immaterial whether the third party involved is a seller or lessor.