**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1224-15T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.H.,

    Defendant-Appellant,

and

A.T., E.R., and G.M.,

    Defendants.

_____

IN THE MATTER OF J.R., G.T.,
and Y.T., MINORS.

_____

        Argued September 11, 2017 — Decided October 19, 2017

        Before Judges Accurso and O'Connor

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Union
        County, Docket No. FN-20-0131-13.

        Beatrix W. Shear, Designated Counsel, argued
        the cause for appellant (Joseph E. Krakora,

Public Defender, attorney; Ms. Shear, on the briefs).

Elizabeth Erb Cashin, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Cashin, on the brief).

Karen Ann Lodeserto, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Lodeserto, on the brief).

PER CURIAM

Following a fact-finding hearing in this Title Nine matter, the Family Part court found defendant A.H. abused Y.T. (baby).[1] A.H. appeals from the March 25, 2014 order memorializing that decision. We remand for further proceedings.

I

The pertinent individuals in this matter are (1) the baby; (2) her mother, defendant A.T. (mother); (3) her brother, J.R. (brother); (4) her sister, G.T. (sister); and (5) defendant A.H., the mother's boyfriend. Although the mother is also a defendant, she did not appeal the court's finding she, in addition to A.H., harmed the baby in violation of N.J.S.A. 9:6-

---

[1] We employ the use of initials to protect the privacy of the parties and their family members.

8.21(c).  Thus, for simplicity we refer to A.H. as "defendant" for the balance of this opinion.[2]

The material evidence adduced at the fact-finding hearing was as follows.  At the time of the subject incident in March 2013, the baby was eight months old, and her brother was four and her sister six years of age.  The three children lived with their mother, who was in a dating relationship with defendant from November 2012 to May 2013.  Defendant had his own home and did not live with the mother and children, but he spent a fair amount of time in her home, spending the night three to four times per week.  When he stayed overnight, defendant slept in the same room as the mother and baby.

In January 2013, the mother noticed the baby was losing her hair.  A doctor diagnosed alopecia (hair loss) and prescribed a topical steroid, but the baby continued to lose her hair over the next two months.  On March 28, 2013, the mother noticed the baby's scalp was swollen, and by April 1, 2013, the baby's condition worsened.  Her scalp, forehead, and eyelids were swollen and her eyelids appeared bruised.  The baby was taken to the emergency room and admitted to the hospital that day.

---

[2]  The two remaining defendants are E.R., the baby's and the brother's father, and G.M., the sister's father.  Neither was implicated in the allegations litigated during the fact-finding hearing, and both were eventually dismissed from this matter.

After conducting a number of tests, pediatrician Monica Weiner, M.D., diagnosed the baby's condition as "traction alopecia," meaning the baby's hair had been forcefully pulled out of her head. In a report admitted during the fact-finding hearing, Dr. Weiner stated the force was violent enough to lift the muscles of the scalp off of the baby's skull, causing bleeding beneath those muscles. The blood then trickled down to the baby's face and around her eyes. While in the hospital, the swelling receded and the discoloration around her eyes diminished. Dr. Weiner opined the baby's hair had been chronically pulled for at least two to three months, commencing around the time the mother first noted the baby's hair loss in January 2013.

During the baby's admission, the hospital contacted the Division of Child Protection and Permanency (Division) to report suspected child abuse. The Division executed an emergency Dodd removal[3] of all three children pursuant to N.J.S.A. 9:6-8.29(a). Following the filing of a verified complaint and order to show cause, on April 9, 2013 the court upheld the Dodd removal and ordered the children remain under the Division's care, custody,

---

[3] A Dodd removal refers to the emergency removal of a child from his or her home without a court order pursuant to the Dodd Act. See N.J.S.A. 9:6-8.29(a).

and supervision. Two of the children were not returned to the mother's physical custody until December 2014, and the third was not returned until February 2015. Within a month of being removed from her home in April 2013, the baby's hair had grown back.

During the Division's investigation, both the mother and defendant advised its employees they had not and did not know who had pulled out the baby's hair. The mother reported, except for three hours each weekday when she attended school, she was the baby's sole caretaker. While she was at school, the baby's aunt cared for the child. The aunt had last cared for the baby on March 28, 2013. The mother also informed the Division she never left the children alone with the baby's brother, sister, or defendant.

Division worker Darryl Louis testified the brother told him he saw defendant pulling out the baby's hair, and that the mother told defendant to stop and hit him with a basketball or hanger. The sister, however, told Louis she had never seen anyone pull the baby's hair out.

Another Division worker, Indira Delossantos, testified she was supervising the mother's visit with the children in a McDonald's in September 2013 when the mother stated the baby's hair was "bountiful." The brother then remarked, "remember how

5

[defendant] used to pull [the baby's] hair and blood would come out from her head." The mother replied, "no, no, . . . that never happened. [The baby] used to bleed from her nose, but she never bled from her head." The brother, replied, "Yes, mommy, remember that [defendant] would pull [the baby's] hair and she would bleed from her head?" The worker conceded that, at times, the brother does not tell the truth.

While driving the sister back from visitation to her resource home, the worker asked her if what the brother had stated when in McDonald's were true. The sister replied the defendant used to pull the baby's hair "hard" and made the baby cry. She further stated the mother told defendant to stop, but he would "do it again and again."

There was evidence the sister has behavioral problems and, at times, was very violent. For example, on one occasion the sister picked up the baby while the baby was in her car seat and threw the seat to the ground. The sister also pulled out her own hair at times.

The mother did not but defendant did testify. He claimed he did not do anything to cause the baby's hair to fall out. He further stated he was never left alone with the baby, that the mother was always present when he and the baby were together. Of significance to the court's ultimate findings, defendant

6

mentioned he never woke during the night when he spent the night in the mother's home. Finally, he noted his relationship with the mother ended in the summer of 2013.

The court determined defendant was the person who had been pulling out the baby's hair between January and March 2013. The court found defendant was not credible when he asserted he never woke up when he slept in the mother's room with the baby. The court concluded defendant did in fact wake up "a few times or regularly and that he wanted to conceal that from the [c]ourt." Further, if we understand its reasoning correctly, the court surmised that, on occasion, defendant woke up during the night between January and March 2013 and, while the mother was sleeping and thus not supervising the baby, pulled out hair from the baby's head.

The court did add the siblings' statements corroborated defendant's "utterly incredible testimony," but the court's reason for finding defendant was the culprit was founded on the fact he was not credible when he claimed he always slept through the night, not the content of the siblings' statements. We note here the siblings' statements do not corroborate the premise defendant pulled out the baby's hair while the mother slept, because the siblings would not have been present to witness such

7

actions. The evidence was only the mother, defendant, and the baby were together in the same room overnight.

The court also found the mother had abused the baby because the mother knew or should have known of the "two to three months progression and/or continuation of forceful hair pulling" and, thus, placed the baby in a position of and failed to protect her from being harmed.

The court rejected the premise the aunt was the perpetrator on the ground she had last cared for the baby on March 28, 2013. However, the court did not explain how such fact exonerated the aunt; after all, the most serious symptoms of hair pulling began to manifest themselves on this date, progressing in severity until the mother took the child to the emergency room on April 1, 2013.

II

The standards governing our limited review are well defined. Findings of fact by a trial court are considered binding on appeal if supported by adequate, substantial and credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974). However, if the issue to be decided is an "alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," we expand the scope of our review. In re

8

Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993) (quoting Snyder Realty, Inc. v. BMW of N. Amer., Inc., 233 N.J. Super. 65, 69 (App. Div.), certif. denied, 117 N.J. 165 (1989)). A trial court's legal conclusions and the application of those conclusions to the facts are also subject to plenary review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Of course, our review of a trial court's findings of fact and the conclusions it draws from those findings presupposes the court made such findings sufficiently clear to enable us to engage in a meaningful review. That requires a trial court clearly articulate how the facts support its legal conclusions and substantiate the relief awarded to the prevailing party. "[T]he trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." Curtis v. Finneran, 83 N.J. 563, 570 (1980); see also R. 1:7-4(a) (requiring court to find the facts and state its conclusions of law in all actions tried without a jury).

Here, the trial court was free to find defendant was not credible when he testified he never woke up when slept overnight in the mother's home, and we must accept and defer to that finding. See Dolson v. Anastasia, 55 N.J. 2, 7 (1969) (noting appellate court must defer to findings grounded on a witness's

9

demeanor or other criteria not transmitted by the written record).  But the <u>conclusions</u> a trial court draws from such factual findings are not immune from appellate scrutiny.

Here, the court determined because defendant was not candid about waking up during the night then, when he did wake up, he must have gone over to the baby's crib and pulled out her hair while she and the mother were sleeping.  What is missing in the court's analysis is the connection between defendant's false statement and the conclusion defendant pulled out the baby's hair.  The court's leap from finding defendant was not candid about waking up in the night and concluding he must have been the one to have pulled the baby's hair is not supported by any reasoning connecting the falsehood to the infliction of harm.  In addition, there were others who had access to the baby during this period, specifically the mother, the aunt, and the two siblings.  The court did not address how it eliminated them as responsible for the baby's injuries.

Because the trial judge's opinion omits critical findings to support the conclusions reached, it falls short of the requirements of <u>Rule</u> 1:7-4(a).  This gap impedes appellate review, requiring a remand to provide the trial court the opportunity to clarify its findings.  Accordingly, we remand this matter to the trial court for sixty days to afford the

10

court to make these findings.  Defendant A.H. shall have fifteen days from the day he receives the court's decision to file a brief, which shall not exceed ten pages in length.  The Division and the Law Guardian shall have fifteen days from the day they receive defendant's brief to file their response brief, which also shall not exceed ten pages in length.

Remanded for further proceedings consistent with this opinion.  We retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11