**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4113-23

IN THE MATTER OF THE
ESTATE OF JAMES G.
MARTIN, deceased.

_____

Submitted September 11, 2025 – Decided November 3, 2025

Before Judges Mawla and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000399-20.

Hegge & Confusione, LLC, attorneys for appellant Therese Rogers (Michael Confusione, of counsel and on the brief).

Buchan, Palo & Cardamone, LLC, attorneys for respondents James H. Martin, Michael P. Martin, and Ann P. Martin (David R. Cardamone, on the brief).

PER CURIAM

Appellant Therese Rogers[1] (Therese) appeals from the June 11, 2024 order declaring invalid and setting aside the March 29, 2019 will (the 2019 will) of decedent James G. Martin (Senior), admitting Senior's November 14, 2018 will (the 2018 will) to probate, ordering Therese to provide an accounting, and awarding reasonable attorneys' fees to be paid out of the estate. She also appeals from the August 20, 2024 order awarding plaintiffs $67,235 in attorneys' fees and $6,441.44 in costs. We affirm the first three provisions of the June 11, 2024 order but reverse and remand the award of attorneys' fees and costs in both orders.

I.

Following Senior's February 2020 death, three of his six children, James H. Martin (Jimmy), Michael P. Martin (Mickey), and Ann P. Martin (Ann) (collectively, plaintiffs) presented his 2018 will for probate, contesting the validity of the 2019 will. Plaintiffs alleged the 2019 will was the product of Therese's undue influence. After the first trial, the probate court admitted the 2019 will, finding Senior acted of his own volition in its execution. On appeal, we concluded the court erred in its undue influence analysis, reversed the order,

---

[1] Consistent with the record, we refer to decedent as Senior and to his children by their first names or nicknames. No disrespect is intended.

and remanded for a new trial before a different judge. In re Est. of Martin, No. A-1772-21 (App. Div. Jan. 11, 2024) (slip op. at 11, 22).

After the four-day retrial, the judge issued an oral decision in which he meticulously sifted through the testimony, made detailed findings of credibility, and considered the facts in light of controlling law. The trial testimony consisted of Jimmy, Mickey, Ann, Therese, and their sister Nora Ann Drew (Nora); Barbara McNulty, the attorney who drafted the 2019 will; and two of Senior's acquaintances, Nadine Phelan and Charles Opramolla.

Following the death of his second wife Louise, Senior executed the 2018 will, which superseded a 2017 will (the 2017 will) not at issue here. Consistent with the 2017 will, the 2018 will specifically excluded Therese and Nora, who were estranged from Senior since his twenty-seven-year marriage to Louise. The 2018 will bequeathed $10,000 to Jimmy in recognition of his financial assistance to Senior and left the residuary to Jimmy, Mickey, Thomas Martin (Tom), and Ann, to be split twenty-two and one-half percent each, and ten percent to Senior's grandson, Gerard Dixon (Dutch). In March 2019, Senior executed the 2019 will, which bequeathed $100 each to Jimmy, Mickey, Tom, Ann, Nora, and Dutch, and left the residuary to Therese, who was also named executor.

A-4113-23

During 2018, Jimmy had power of attorney for Senior and was his "almost exclusive" caretaker, with assistance from home health aides. Jimmy made structural modifications to Senior's home to help his mobility, paid down Senior's home equity line of credit, and gave him $10,000 for dental work. Later in the year, Senior was hospitalized after a fall. While Senior was hospitalized, Therese and Nora visited him and made amends.

When Senior returned home confined to a wheelchair, Jimmy asked Ann and Therese to assist with Senior's care. Therese, who lived in New Jersey, and Ann, who lived in North Carolina, moved into Senior's house. Around that time, Jimmy suggested to Senior that he execute a new will to include Therese and Ann as beneficiaries. Senior agreed and Jimmy contacted McNulty to draft a new will.

In January 2019, Jimmy returned to his home in Chicago after he and Senior had an argument. When Ann returned to her home in February 2019, Therese remained Senior's live-in caretaker until his death a year later.

While Therese cared for Senior, she was personally involved in McNulty's drafting of the 2019 will. In a March 2019 meeting without Senior present, Therese told McNulty that Senior wanted to bequeath only $100 to each of his children and the remainder to Therese because "Jimmy . . . molested Therese

A-4113-23

and Ann." Therese handwrote an outline of key provisions for the 2019 will, including her inheritance of the residuary estate, and gave the outline to McNulty.

Therese then emailed McNulty at 10:10 p.m. on March 29, 2019, advising her Senior "said [the draft of the 2019 will] was perfect," and urging McNulty to "come over soon" because Senior was "very tired" and "up and down" in the days prior. Despite Senior's fatigue and the late hour, McNulty went to Senior's house that evening, and he executed the 2019 will.

The judge found "a wealth of credible evidence" the 2019 will benefitted Therese, who "stood in a confidential relationship" with Senior. The judge also found suspicious circumstances surrounding the formation of the 2019 will, including evidence of Therese's "machinations . . . to remove certain siblings from Senior's good graces." Notably, Therese and Ann made a "concerted effort" to turn Senior on Jimmy by making "slanderous accusations seemingly out of the blue, that Jimmy had molested" them as children. During trial, Ann admitted the accusation, which was made within earshot of Senior, was a "complete fabrication." Therese also sent Jimmy a text in 2019 admitting she "told Ann something . . . in retaliation for Jimmy's refusal to help her with rent" twenty years earlier.

A-4113-23

Ann also testified Therese "would scream" at Senior, "demanding a house" because she was the only sibling who did not own a home. Ann said Therese bullied her and Senior, repeatedly insisting, "I want a house. Everybody has a house but me. I want a house," while pressing for fairness and compensation for her care of Senior. Ann described the encounters:

> She would just holler at him and she'd stand over him. Therese has a lot of height. She'd place her height, she would stand up over my dad, especially when he said I wanted my son Jimmy on the [2019] will. He's my first born and he's a doctor. And she started screaming at him.

The judge found "Therese's testimony was largely unworthy of belief" for several reasons. Therese concocted false allegations of abuse to tarnish Jimmy in Senior's eyes, and "was the driving force that turned [Senior] against Jimmy and the other siblings."

The judge rejected Therese's claim that, the day after Louise died, Senior discovered "financial irregularities" that he attributed to Jimmy's malfeasance. This contention did not make sense because shortly after Louise's death, Senior executed the 2018 will, which left $10,000 and a share of his estate to Jimmy. It was not until mid-January 2019, after Therese had become Senior's primary caretaker, that Senior began calling Jimmy "a crook."

6

The judge also found Therese not credible because her sworn answers to interrogatories were belied by documentary evidence. She certified she did not converse with anyone about the 2019 will, but she sent text messages to Ann asking whether Ann wanted to be in the will and telling her to read the draft. Therese also certified she only conversed with McNulty's firm to "schedule a consultation for [Senior] with his attorney," but the record was "replete with documents evidencing frequent communications with . . . McNulty." Therese emailed, phoned, and met with McNulty about the 2019 will.

Thus, the judge

> conclude[d] that Therese's testimony did not serve to rebut the presumption of undue influence, it served rather to underscore. Her false and misleading statements served to mask her true intention of securing her father's home[;] to obscure the extent of her involvement in the process of devising a new will in her father's name to achieve that objective; to minimize her discussions with other family members not named [in the 2019 will]; to cut them substantially out of Senior's will; and to hide the fact, contrary to her sworn assertions, that Therese was conversing with Senior about his will and how she should and would stand to benefit at the expense of Jimmy, Mickey, Ann[,] or any other relative.

The judge also noted Senior "was not always the lucid person sitting ramrod straight in his wheelchair," as Opramolla described him. As an almost ninety-five-year-old man dependent on others for his care, Senior and Therese

were not on equal footing. The judge also noted Therese had been administering Xanax to Senior which, according to Mickey, caused Senior to become unresponsive more than once. Therese "attempted to deflect blame" by claiming the dose was at Jimmy's direction, despite the fact Jimmy had already left for Chicago.

The judge also assessed McNulty's testimony, finding she was credible but noting she "shed no light as to why Senior had made such drastic revisions to his will in so short a time period." McNulty "thought" she asked Senior why he believed "Jimmy was a crook," but could not recall, nor did her notes indicate that she inquired or how Senior responded. The judge opined McNulty's "lack of curiosity was compounded by the fact that she did not really know the family, or understand the family dynamics." And despite Therese's involvement in the drafting of the 2019 will, McNulty did not ask Senior any probing questions about his wishes nor was she "watchful for signs of undue influence."

Having found Therese did not rebut the presumption of undue influence, the judge declared invalid the 2019 will, admitted to probate the 2018 will, ordered Therese to provide an accounting, and awarded plaintiffs attorneys' fees to be paid out of the estate.

A-4113-23

On appeal, Therese argues the judge's ruling was not supported by the evidence and misapplied governing law. Specifically, she contends the judge erred by finding undue influence, ruling the evidence failed to rebut the presumption of undue influence, and focusing on the fairness of the 2019 will. She also contests the attorneys' fee award.

II.

We begin with our recitation of the standard of review. "The findings of the trial court on the issues of testamentary capacity and undue influence, though not controlling, are entitled to great weight since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony." Gellert v. Livingston (In re Appeal from Prob. of Alleged Will of Livingston), 5 N.J. 65, 78 (1950). "Such factual findings should not be disturbed unless they are so manifestly unsupported or inconsistent with the competent, reasonably credible evidence so as to offend the interests of justice." In re Will of Liebl, 260 N.J. Super. 519, 524 (App. Div. 1992); see Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974).

"An appellate court is bound by the trial judge's determination of credibility and those findings of fact which are reasonably supported by the

record." C.B. Snyder Realty Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989). When, however, "the focus of the dispute is not on credibility but, rather, alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn" from those facts, "the appellate function broadens somewhat." Ibid.

However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference" by a reviewing court. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We review legal issues de novo. See ibid.

Turning to Therese's substantive contentions, we first address the judge's finding of undue influence. Undue influence is "'mental, moral or physical' exertion which has destroyed the 'free agency of a testator' by preventing the testator 'from following the dictates of [the testator's] own mind and will and accepting instead the domination and influence of another,'" in the disposition of assets. Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163, 176 (1981) (quoting In re Est. of Neuman, 133 N.J. Eq. 532, 534 (E. & A. 1943)). "The burden of establishing undue influence rests with the party contesting the will," In re Estate of Folcher, 224 N.J. 496, 512 (2016), "unless the will benefits one

A-4113-23

who stood in a confidential relationship to the testat[or] and there are additional circumstances of a suspicious character present which require explanation." In re Will of Rittenhouse, 19 N.J. 376, 378-79 (1955).

When there is a confidential relationship, that is "where trust is reposed by reason of the testator's weakness or dependence or where the parties occupied relations in which reliance is naturally inspired or in fact exists," In re Estate of Hopper, 9 N.J. 280, 282 (1952), and suspicious circumstances, which "need only be slight," a presumption of undue influence arises. In such circumstances, the burden of proof shifts to the proponent of the will "to overcome the presumption," In re Estate of Stockdale, 196 N.J. 275, 303 (2008), ordinarily by a preponderance of the evidence, Haynes, 87 N.J. at 177-78.

We are satisfied the judge's finding of undue influence was well-grounded in the record. There is no dispute Therese, as Senior's caretaker, was in a confidential relationship with him. The record also supports the judge's determination there were suspicious circumstances surrounding the 2019 will, including Therese's "machinations" to paint her siblings in a bad light and her personal involvement in the creation of the 2019 will, which greatly benefitted her. The establishment of these two factors shifted the burden to Therese to

11

prove, by a preponderance of the evidence, the 2019 will was not the product of undue influence.

We discern no error in the judge's determination Therese failed to rebut the presumption of undue influence. As detailed in his oral opinion, the judge found Therese lacked credibility and veracity. Her alternative explanations for Senior's alleged change of heart were not plausible and McNulty's testimony provided little elucidation because she did not engage in a fulsome inquiry of why Senior wanted to so drastically alter his will.

We are unpersuaded by Therese's argument the judge misapplied the law by focusing on the fairness of the 2019 will. Nowhere in the judge's decision did he discuss or consider the fairness of the estate distribution. Rather, consistent with the well-established burden-shifting framework, he determined Therese failed to rebut the presumption of undue influence by a preponderance of the evidence.

We next turn to the award of attorneys' fees, which Therese argues were improperly awarded under Rule 4:42-9(a)(3). "[F]ee determinations by trial [judges] will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). "While

12

deference will ordinarily be given to discretionary decisions, such decisions will be overturned if they were made under a misconception of the applicable law." O'Neill v. City of Newark, 304 N.J. Super. 543, 550 (App. Div. 1997). When the decision turns on a question of law that flows from established facts, the trial judge's decision is not entitled to any deference, and appellate review is de novo. See Dempsey v. Alston, 405 N.J. Super. 499, 509 (App. Div. 2009).

In a will contest, the award of attorneys' fees and costs is discretionary because:

> if probate is refused, the court may make an allowance to be paid out of the estate of the decedent. If probate is granted, and it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate.
>
> [R. 4:42-9(a)(3).]

"To satisfy the rule's 'reasonable cause' requirement, those petitioning for an award of counsel fees must provide the court with 'a factual background reasonably justifying the inquiry as to the testamentary sufficiency of the instrument by the legal process.'" In re Prob. of Alleged Will & Codicil of Macool, 416 N.J. Super. 298, 313 (App. Div. 2010) (quoting In re Prob. of Alleged Will & Codicil of Caruso, 18 N.J. 26, 35 (1955)). That stated, "[e]xcept

in a weak or meretricious case, courts will normally allow counsel fees to both proponent and contestant in a will dispute." In re Reisdorf, 80 N.J. 319, 326 (1979).

While the award of attorneys' fees was within his discretion, the judge did so without addressing whether reasonable cause warranted the award or determining counsel's certification of fees was reasonable. Because the decision lacked the requisite findings and analysis under Rule 1:7-4, we are constrained to reverse and remand the award of attorneys' fees for further consideration.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division