# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0322-18T4

D.H.,

    Plaintiff-Appellant,

v.

C.H.,

    Defendant-Respondent.

_____

> Submitted February 25, 2019 – Decided April 4, 2019
>
> Before Judges Messano and Gooden Brown.
>
> On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-1614-17.
>
> Central Jersey Legal Services, Inc., attorneys for appellant (Susan J. McCue, on the briefs).
>
> Mark A. Bailey, attorney for respondent.

PER CURIAM

    Plaintiff D.H. appeals from a September 17, 2018 Family Part order, dismissing her domestic violence complaint and temporary restraining order

(TRO), and denying her application for a final restraining order (FRO) against defendant C.H., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  Because we agree with plaintiff that the trial court misapplied the second prong of the two-part test enunciated in Silver v. Silver, 387 N.J. Super. 112, 126 (App. Div. 2006), and misinterpreted A.M.C. v. P.B., 447 N.J. Super. 402 (App. Div. 2016), we reverse and remand to the trial court for entry of an FRO.

We glean the following facts from the record.  From 2012 to 2016, the parties dated on-and-off and resided together intermittently.  The last time they lived together in defendant's Plainfield apartment was from April to August 2016.  On May 18, 2017, plaintiff filed a complaint against defendant alleging that he had committed acts of domestic violence against her, specifically assault and harassment, and seeking injunctive relief under the PDVA.  In the complaint, plaintiff asserted that at about 6:30 a.m. on June 18, 2016, during a verbal altercation with defendant over her spending the night in New York where she worked, she was subjected "to name calling and profanity" that continued throughout the course of the day during telephone conversations.  Plaintiff ultimately relented and returned to defendant's apartment that day after he threatened "to put [her] clothes outside" if she stayed in New York.

Later that night, at about 9:00 p.m., when plaintiff refused to acquiesce to defendant's demand for her cell phone, defendant "grabbed her right arm and forcefully twisted [it] into her back." "Thereafter[,] defendant pushed plaintiff to the floor[,] causing [her] to fall face down[,] while . . . twisting [her] arm forcefully" and "plac[ing] his knees onto [her] legs so [she] could not get up." Defendant released her after she "screamed for help," but plaintiff suffered "excruciating pain on [her] right wrist and could not move [her] hand." According to the complaint, after defendant released her, he stated, "let me call my dad[,] I know I am going to jail." Defendant also told plaintiff, "I have a gun[,] when do you want to die?"

Plaintiff further alleged in the complaint that other than calling defendant's sister, "she did not report the incident" because "she was afraid due to the multiple threats made by . . . defendant" to "report[] [her] to immigration authorities if she called the police." Also, defendant apologized and helped her treat "her injury with home remedies." It was not until August 3, 2016, when a "doctor inquired about [her] hand injury" during routine "medical appointment" that plaintiff "broke down" and disclosed the incident and was counseled "to leave . . . defendant as she was risking more harm." Plaintiff left defendant's apartment the following day and moved to New York where she underwent

A-0322-18T4

surgery on her hand and obtained a TRO, which she subsequently dismissed in order to apply for a TRO in New Jersey.

The complaint also detailed a history of verbal and physical abuse, during which defendant "shook," "hit," and "pushed" plaintiff. Additionally, in a June 2016 incident, defendant berated her in a pharmacy. In an April 2016 incident, "defendant poured water all over [plaintiff's] body" after "[she] refused to have . . . sexual relation[s]." In another 2016 incident, plaintiff awoke to defendant holding "a kitchen knife on top of her face." When she "screamed, . . . defendant laughed and went back to the kitchen." In yet another 2016 incident, "defendant locked the doors of the car while plaintiff was inside, subjected [her] to profanity and name calling[,] and prevented [her] from leaving for at least [twenty] minutes."

Based on plaintiff's complaint, a TRO was granted on May 18, 2017, but was not served on defendant until August 1, 2018. On September 17, 2018, a Family Part judge conducted a final hearing, during which both parties testified and were represented by counsel. During the hearing, plaintiff recounted the events of June 18, 2016, consistent with the allegations in her complaint. While detailing the assault, she testified that although she had "never [cried] out for help" during prior incidents of abuse because "it [was] too embarrassing[,]" on

A-0322-18T4

this occasion "[she] screamed . . . for help but no one came to [her] aid." Plaintiff testified that she continued her relationship with defendant after the incident because "[defendant] said he was sorry." According to plaintiff, defendant also took "care of [her] hand[,]" "help[ed her] get dressed[,]" and "gave [her] pain killers" for the pain.

On July 17, 2016, when the pain in her hand became "unbearable" and the swelling persisted, defendant accompanied plaintiff to the emergency room (ER) at JFK Hospital to seek medical treatment. However, prior to going to the hospital, to ensure her silence, defendant threatened to "have [plaintiff] deported" because she did not "have [her] papers[,]" and "told [her] dead men tell[] no tales." As a result, when asked how she had injured her hand, plaintiff told the ER doctor she "fell" "a few weeks earlier." Plaintiff was given "a splint" and told by the doctor to "seek help immediately from [an] orthopedic doctor[,]" but she did not follow up.

However, on August 3, 2016, when her New York doctor inquired about her hand during a regular gynecological "check up," plaintiff "broke down and . . . told . . . the truth." She was advised that if she stayed, she "risk[ed] getting hurt even more" and a social worker gave her information about shelters. Although plaintiff returned to defendant's apartment that day, the following

5

morning, after defendant left for work, she gathered her belongings and left for good. She left a note at the apartment, thanking defendant for everything he had done for her,[1] and the key to the apartment at a local Chinese restaurant they frequented. Later, when defendant came home and discovered she had gone, he called and chastised her angrily, telling her she had "disrespected him."

Over the next several months, plaintiff stayed in a series of shelters in New York and experienced periods of homelessness. On October 10, 2016, she underwent surgery at Jacoby Medical Center in New York "[t]o repair the ligaments in [her] hand" and was hospitalized there for a month due to complications. After she was released from the hospital, she had telephone conversations with defendant, some of which she initiated, during which "he was apologetic." However, plaintiff "made up [her] mind to move on" and, eventually, on December 27, 2016, reported the June 18, 2016 assault to the Plainfield Police Department. Subsequently, in January 2017, she obtained a restraining order against defendant in the Bronx. However, she later dismissed the New York restraining order and applied for one in New Jersey as instructed by "the [P]rosecutor's [O]ffice."

---

[1] The note, which was admitted into evidence, stated "Thanks ever. I appreciate all [you have] done for me. God Bless you."

During her testimony, plaintiff also related the prior incidents of domestic violence detailed in her complaint, including when defendant berated her in a pharmacy, held a kitchen knife over her, locked her in the car while screaming profanities, and "shook [her] like a rag doll" for not "agree[ing] with him." Plaintiff said the incident with the kitchen knife "terrified" her and caused her to have "recurring nightmares[.]" Plaintiff testified that the abuse "was just continuous[,]" because when defendant got "angry," he was "uncontrollable." After each incident, he would apologize, pledge his love to her, and promise not to "do it again." With her injured hand still in a sling over two years after the incident, plaintiff testified at the hearing that she was seeking a restraining order because she was "scared for [her] life." According to plaintiff, when she was living with defendant, he repeatedly threatened that if she got "him in any trouble[,] his family [would] kill [her] because [they] love[d] him very much."

In contrast, defendant denied ever having any violent altercations with plaintiff, denied ever threatening her, and denied all the incidents of domestic violence alleged by plaintiff. Contrary to plaintiff's account, defendant testified that on the night of June 18, 2016, plaintiff repeatedly hounded him about "when [he was] going to marry her" so that she could "get her paper[s,]" and blamed him for her missing her father's funeral in Trinidad because, given her

7

immigration status, she "could not travel" outside of the country. When defendant repeatedly replied that he was "not ready to marry yet[,]" plaintiff became "very upset" and angry and "start[ed] hitting [him on his] head with her cell phone." When he raised his hands "in the air to shield" himself from the blows and tried "to get away from her[,]" he fell "on the kitchen floor and she fell on top of [him]." "When [they] both [got] up off the floor[,]" plaintiff "called [his] sister" and accused him of "trying to take away her cell phone[,]" but defendant denied touching her. According to defendant, for "[t]he rest of the night," plaintiff continued "cursing" at him until "[they] both went to bed," but he never responded. Defendant testified that although he had previously told plaintiff he was "willing to marry her," she consistently pressured him about it, a claim she denied.

Defendant also testified that he accompanied plaintiff to the ER at JFK hospital on July 17, 2016, because plaintiff complained of pain in her right hand. According to defendant, plaintiff had always complained of pain in that hand since he met her. After an x-ray, the doctor diagnosed her with arthritis and released her. When they were leaving the ER, plaintiff explained to defendant that two weeks earlier, "she was running late [for] work" and had tripped and

fallen "getting out of the train."  Thus, defendant attributed the pain to that incident.

Defendant also disputed plaintiff's account of her leaving his apartment, and claimed she left on August 3, not August 4, 2016.  According to defendant, he left plaintiff in the apartment when he went to work at 5:30 a.m. that morning, but when he returned home at about 5:30 p.m., he found a thank you note from plaintiff, "[his] place ransacked," and "[his] stuff" thrown "on the floor."[2] Although defendant attributed the condition of the apartment to plaintiff, on cross-examination, she vehemently denied leaving the apartment in that condition.

Defendant further testified that after August 3, plaintiff called him "several times" asking "to come back" and asking him to marry her "so she [could] get her papers[,]" but he refused.  During their last conversation, which occurred in November 2016, plaintiff "said she must f*** [him] up."  Defendant

---

[2]  During the hearing, the judge admitted into evidence photographs of defendant's apartment, purportedly depicting its condition as he described it when he returned home from work on August 3, 2016.

testified he had no further contact with plaintiff and learned about the complaint when he was served with the New York restraining order in January 2017.[3]

Following the hearing, after applying the two-prong <u>Silver</u> analysis as well as the factors delineated in N.J.S.A. 2C:25-29, the judge found that the entry of an FRO was not justified and dismissed the TRO. In an oral opinion, the judge determined that the parties were subject to the jurisdiction of the PDVA by virtue of their "dating relationship" and the "fact [that they] lived together."

The judge then described the parties' testimony as follows:

> [F]rankly[,] as confusing as I found plaintiff's testimony, and as inconsistent as it seemed to be, the plaintiff was very, very emotional obviously. There was some part of her testimony that was reasonable . . . . I [do not] find that she was evasive. But there were things about the logical progression of her testimony that she never sought help, both for her physical injury and for the protection that she was looking for or that she felt that she needed, despite the severity of her complaints[,] that was the most troubling.
>
> But I also found that . . . defendant's testimony was difficult to follow as well. . . . Again[,] this whole thing is tied back into his refusal to marry her. And she

---

[3] In his defense, defendant implied that plaintiff's motivation for fabricating the domestic violence allegations was to obtain a domestic violence waiver to avoid deportation. However, plaintiff testified that she did not learn about the waiver until after she had filed for the restraining order.

was the one[,] according to him[,] who initiated this incident [on June 18, 2016,] and he was simply defending himself. I [do not] know that [that is] true.

. . . [H]e says . . . she fell on top of him, they both got up. And again they argue the rest of the night. But according to him[,] she was the one who was arguing, he sat there and said nothing. But he said that there was no injury that night. I do believe that there was an injury that night. [I am] not sure exactly how it occurred, but I do believe that there was an injury that night.

I do believe that this was a volatile relationship between them and that some incident occurred . . . that evening [in June 2016]. I do believe that there was verbal abuse between the two parties, because they have a core issue which was were they going to get married.

On . . . July 17, 2016[,] they went to the [ER]. She complained of injury to the right hand. And he said she always complained of pain to that hand. . . . [H]e says that this incident occurred . . . earlier than June of [2016] when she fell off a train. I [do not] know that I believe that to be true either.

We get to the August 3, 2016 incident[,] when he leaves for work and he comes home and finds the apartment in the condition [that is] depicted in the pictures. He said he made no changes to the . . . note that was left . . . . He said that she left on her own, [he did not] know where she went.

She called him several times. And again she says that she called him several times. [There is] a difference in terms of what was said after she left on August 3rd or August 4th, but again she contacted him.

11

> If she was so devastated, so afraid of him[, I am] not so
> sure she would be contacting him.

Based on this assessment, the judge found "by a preponderance of the evidence" that "the predicate act[s]" of "assault," N.J.S.A. 2C:12-1(a), and "harassment," N.J.S.A. 2C:33-4(b), occurred as a result of the June 18, 2016 incident and resulting injury to satisfy the first <u>Silver</u> prong.[4] However, the judge determined that "given the time frame," there was no "immediate danger to the person or property of the plaintiff" to satisfy the second <u>Silver</u> prong.

The judge explained:

> This incident occurred in June of 2016. The first complaint was not brought to the attention of the police department until the end of 2016 when it was reported to the Plainfield Police Department. And then [plaintiff] . . . gets a TRO out of the Bronx which was subsequently voluntarily dismissed in January of 2017, and then five months later [obtains the present TRO].
>
> And so my concern in this case is I [do not] find that [there is] the immediate danger to person or property. . . . And under [<u>Silver</u>], even if I find a predicate act has occurred[,] the [c]ourt must then

---

[4] Under N.J.S.A. 2C:12-1(a)(1), a person is guilty of simple assault if he "[a]ttempts to cause or purposely, knowingly[,] or recklessly causes bodily injury to another[.]" N.J.S.A. 2C:11-1(a) defines "[b]odily injury" as "physical pain, illness[,] or any impairment of physical condition[.]" Under N.J.S.A. 2C:33-4(b), a person commits harassment if, "with purpose to harass another," he "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so[.]"

12

decide whether [there is] immediate danger to person or property warranting the entry of an FRO.

[There has] been [no] contact between these parties coming up on a year. . . . He [has not] reached out to her. If any[thing,] the person who has reached out to the other more frequently was . . . plaintiff who . . . prior to the end of October of 2016[,] was reaching out to him, he was not reaching out to her with any frequency, but certainly not since October of 2016.

So I [do not] find that there is a need for the entry of [an FRO]. The relationship between these parties is over. [There is] no need for there to be contact between them. They can go their separate ways.

After the judge entered a memorializing order dismissing the complaint and the TRO, plaintiff moved to stay the order and reinstate the TRO pending appeal. In denying plaintiff's motion, the judge reiterated that he considered the factors delineated in N.J.S.A. 2C:25-29(a) and determined that only N.J.S.A. 2C:25-29(a)(1), pertaining to a "previous history of domestic violence" between the parties, and N.J.S.A. 2C:25-29(a)(2), pertaining to "[t]he existence of immediate danger to person or property[,]" were applicable.[5] The judge also

---

[5] Under N.J.S.A. 2C:25-29(a), in determining whether to issue final restraints,

[t]he court shall consider but not be limited to the following factors:

explained that in making his decision, he reviewed <u>A.M.C.</u> and found "the facts in that case . . . legally and factually distinguishable."

The judge elaborated:

> In [<u>A.M.C.</u>,] the incident occurred on June 7, 2015. Two days later . . . the victim fled to a domestic violence shelter, filed a domestic violence complaint[,] and obtained a temporary restraining order all on the same date, within two days of the incident itself.
>
> The trial court in that case paid a great deal of attention to the fact that the defendant[,] who was a police officer[,] had not been properly served with a TRO per the policy and procedure that was in place. That certainly [did not] exist in this case.
>
> In this situation, and in that case as well, there were significant incidents of domestic violence which

---

(1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment[,] and physical abuse;

(2) The existence of immediate danger to person or property;

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety; and

(6) The existence of a verifiable order of protection from another jurisdiction.

14

were verifiable. . . . And the trial court in that case focused on the fact that the defendant apparently had no desire to have a continuing association with the plaintiff and that there were no children and therefore no need for interaction going forward.

Obviously we [do not] have any children in this case. And the plaintiff in that case argued that the decision to leave and take refuge in a shelter shows her fear of the defendant. In this case in particular[,] . . . plaintiff remained with . . . defendant for . . . two months following the claimed incident and [did not] seek court intervention [in New York] until approximately six months following the incident . . . . And then another five months before seeking New Jersey assistance, for a total of [eleven] months after the claimed incident.

The judge also noted that while Silver underscored "whether a domestic violence restraining order should be issued is most often perfunctory and self-evident[,]" the Silver court also directed judges "to look at the facts[,]" which is what the judge "did in making [his] decision in this case."[6] The judge entered a memorializing order and this appeal followed.[7]

Ordinarily, "[i]n our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's

---

[6] We construe the judge's comments as an amplification of his decision as permitted under Rule 2:5-1(b).

[7] Subsequently, on plaintiff's motion, "[w]e stay[ed] the Family Part's order and reinstate[d] the TRO . . . pending appeal."

A-0322-18T4

findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998).

However, reversal is warranted when a trial court's findings are "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). Likewise, "if the court ignores applicable standards, we are compelled to reverse and remand for further proceedings." Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008). Moreover, our review of a trial court's legal conclusions is always de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

In Silver, we determined that the trial judge must perform two tasks at an FRO hearing before deciding whether to grant or deny final relief to a person protected under the PDVA.[8] 387 N.J. Super. at 125-26.

---

[8] Under N.J.S.A. 2C:25-19(d), a person protected under the PDVA "includes any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship" or by a present or former household member, if the victim is eighteen years of age or older or an emancipated minor. Here, as the judge correctly found, plaintiff falls under the PDVA's protections.

A-0322-18T4

First, the judge must determine whether plaintiff proved, by a preponderance of the credible evidence, that defendant committed one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a). If the judge finds plaintiff did not meet this burden of proof, the court must dismiss the complaint. But if the court finds a defendant committed one or more of the predicate acts listed in N.J.S.A. 2C:25-19(a), the judge must determine whether an FRO is needed to protect the victim.

[A.M.C., 447 N.J. Super. at 413 (citing Silver, 387 N.J. Super. at 125-26.)]

In determining whether an FRO is needed to protect the victim, we offered the following guidance:

Although this second determination--whether a domestic violence restraining order should be issued-- is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29a(1) to -29a(6), to protect the victim from an immediate danger or to prevent further abuse.

[Silver, 387 N.J. Super. at 127.]

Here, despite finding that defendant committed the predicate acts of assault and harassment, delineated in N.J.S.A. 2C:25-19(a)(2) and (13), respectively, based on the events of June 18, 2016, and despite finding a previous history of domestic violence including "harassment and physical abuse," N.J.S.A. 2C:25-29(a)(1), based on the parties' "volatile relationship,"

17

the judge refused to issue restraints. In A.M.C., we emphasized that when determining whether a court may "properly refuse to issue restraints" despite "finding that a defendant committed one [or more] of the predicate acts listed in N.J.S.A. 2C:25-19(a)," courts may consider two key factors: "(1) a lack of evidence demonstrating a history of domestic violence or abuse; and (2) the commission of a predicate act that does not involve physical violence against the victim." 447 N.J. Super. at 414.

Here, both a history of domestic violence and a predicate act involving physical violence were clearly present. Nonetheless, in finding no need for restraints, the judge focused on the parties' conduct after their separation, explaining "[t]he relationship between these parties is over. [There is] no need for there to be contact between them. They can go their separate ways." However, in the course of this analysis, as we found in A.M.C., "the judge minimized one of the principal concerns that drove our analysis in Silver. Whether the predicate offense involved a violent act." Id. at 416 (citing Silver, 387 N.J. Super. at 127). In A.M.C., while we acknowledged "'that the Legislature did not intend that the commission of any one of these [predicate] acts automatically mandates the issuance of a domestic violence order[,]'" id. at 417 (quoting Silver, 387 N.J. Super. at 123), we reiterated that "[w]hen the

predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" Ibid. (quoting Silver, 387 N.J. Super. at 127).

Guided by these principles, we are satisfied plaintiff has established the need for an FRO as a matter of law. We reach this conclusion based on defendant's commission of a predicate act that involves physical violence against plaintiff, N.J.S.A. 2C:12-1(a), N.J.S.A. 2C:25-19(a)(2); the evidence demonstrating a previous history of domestic violence and abuse between the parties, N.J.S.A. 2C:25-29(a)(1); and the fact that, under the circumstances, the issuance of final restraints is undoubtedly in plaintiff's best interests, N.J.S.A. 2C:25-29(a)(4). "In short, this is the type of case for which the issuance of final restraints should have been axiomatic or, . . . 'perfunctory and self-evident[,]'" A.M.C., 447 N.J. Super. at 418 (quoting Silver, 387 N.J. Super. at 127), in order "to prevent further abuse[,]" Silver, 387 N.J. Super. at 127, notwithstanding the fact that, arguably, there was no "immediate danger . . . ." Ibid.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0322-18T4