# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4174-18T3

I.E.A.,

    Plaintiff-Appellant,

v.

M.A.,

    Defendant-Respondent.

_____

Submitted September 29, 2020 – Decided December 16, 2020

Before Judges Sabatino and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-0953-19.

Bressler, Amery & Ross, attorneys for the appellant (Ross A. Fox, on the brief).

Respondent has not filed a brief.

PER CURIAM

Plaintiff I.E.A.[1] appeals from the March 12, 2019 order of the Family Part denying her application for a final restraining order (FRO), and dismissing her complaint and a January 18, 2019 amended temporary restraining order (TRO) against defendant M.A. pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35. We vacate the March 12, 2019 order, reinstate the complaint and TRO, and remand for a new trial.

I.

The following facts are derived from the record. The parties are cousins whose 2016 marriage in Sudan was arranged by their families. Defendant is a United States citizen; plaintiff is a citizen of Sudan. Shortly after the wedding, defendant returned to New Jersey, leaving a pregnant plaintiff with her family in Sudan. Plaintiff gave birth to the couple's only child, who has special needs, before coming to New Jersey with the child on a temporary visa in March 2018.

On September 10, 2018, plaintiff filed a complaint and application for a TRO against defendant alleging assault, terroristic threats, and harassment as predicate acts of domestic violence. The court entered a TRO that day. On

---

[1] We use initials to preserve the confidentiality of court records concerning domestic violence. R. 1:38-3(d)(9).

A-4174-18T3

October 17, 2018, plaintiff filed an amended complaint and application for a TRO, also alleging assault, terroristic threats, and harassment as predicate acts of domestic violence. The court entered an amended TRO the same day. The court entered a second amended TRO on January 18, 2019.

At trial, plaintiff testified that defendant was in Sudan on February 26, 2018, the day her grandparent died. He refused to accompany her to the funeral. According to plaintiff, when she questioned defendant about his refusal, he repeatedly slapped, hit, and kicked her, including while she was on the floor after having tripped during the assault. She testified that defendant's brother stopped the assault after she briefly escaped and shouted for help.

Plaintiff also testified that on June 13, 2018, in New Jersey, she received defendant's permission to go with several women to have henna applied to her hands for a religious holiday. According to plaintiff, when she arrived home late an angry defendant pushed her, reminded her of the assault in Sudan, and said that if he beat her his brother would not be there to intervene and he would continue the assault until she needed hospitalization.

Plaintiff testified that defendant assaulted her twice in July 2018. She testified that on the first occasion, she and defendant were having an amicable exchange when she jokingly struck his behind. According to plaintiff, defendant

<span>A-4174-18T3</span>

became angry and repeatedly hit her on her back and shoved her with his foot on her lower back. A few days later, according to plaintiff, in an unprovoked and sudden assault, defendant threatened her with a belt and choked her with sufficient force that her hands became numb. She testified that she thought, at first, that defendant was joking but realized soon after he was assaulting her.

Finally, plaintiff testified that in August 2018, defendant, unprovoked and suddenly, slapped her in the face, kissed her, and then slapped her again. She testified that she remained afraid of defendant.

In August 2018, plaintiff reported defendant's physical abuse to a neighbor. The neighbor put plaintiff in touch with A.E., a woman originally from Sudan who shares plaintiff's religious background. Plaintiff told A.E. that defendant abused her physically and verbally and that she wanted to return to Sudan. According to plaintiff, while defendant did not object to her returning to Sudan he would not permit her to take their son out of the United States. Plaintiff did not want to return to Sudan alone, fearful defendant would not give her permission to leave the country once she got there. With the assistance of A.E., plaintiff moved out of the apartment she shared with defendant to live with a relative. She subsequently moved to a shelter for victims of domestic violence.

A-4174-18T3

Later that month, A.E. accompanied plaintiff to defendant's apartment to retrieve her belongings. At plaintiff's request, police were present. Although defendant was in the apartment, he did not respond to repeated requests by police to open the door. According to plaintiff and A.E., who testified at trial, after the police gained entry, defendant angrily called plaintiff vulgar names in Arabic, accusing her and her mother of promiscuity and prostitution. A.E. testified that accusations of this nature from a husband to his spouse could result in plaintiff being shunned, isolated, and badly treated by the Sudanese community.[2]

Defendant denied ever assaulting plaintiff. He admitted that he refused to attend the funeral of her grandparent, but testified that his family members went to the funeral with plaintiff, who was satisfied with that arrangement after "a little bit" of an argument. In addition, defendant testified that he was too tired to assault plaintiff while in New Jersey because he worked long hours. He recalled plaintiff having returned late from having her hands dyed with henna. He denied pushing or threatening plaintiff on that occasion, testifying that he could not have been angry because the following day was a religious holiday and people are happy on religious holidays. Defendant admitted, however,

---

[2] The complaint alleges that in July 2018, defendant threatened to strike plaintiff if she did not stop asking him questions and regularly bit her and hit her on the top of her head. Plaintiff produced no proof with respect to these allegations.

A-4174-18T3

saying to plaintiff "I don't care about you," and repeating the Sudanese saying "he who follows the chicken go to the garbage," an apparent warning against keeping company with undesirable people. Notably, despite defendant's testimony that he rarely gets angry and was unbothered by anything plaintiff did, the transcript notes several occasions during which defendant was yelling while testifying about plaintiff.

Defendant recounted the day on which police accompanied plaintiff to retrieve her belongings from his apartment. He admitted cursing at her in Arabic during the encounter. He testified that he was upset that plaintiff told the police the couple was no longer sexually intimate.

A fourth witness, H.I., testified at trial. She admitted to a close relationship with defendant, whom she met while both were attending college. H.I. testified that she and defendant worked for her father's company driving school buses. On cross-examination, she admitted that defendant pays her monthly cellphone bill. Although she claimed that she pays him back, she offered no proof for that assertion. In addition, testimony established that defendant took H.I. to the hospital when she gave birth to a child shortly before plaintiff's arrival in the United States. Defendant admitted that on one occasion

6

he called police to avoid a violent confrontation with H.I.'s husband during a domestic violence incident. He denied having once proposed marriage to H.I.

H.I. testified that when plaintiff arrived in the United States, defendant was living with male roommates. He asked H.I. to house plaintiff and her child in her apartment. H.I. had recently had a child and, like plaintiff, was not working. The two women and their infants lived together from March 2018 to May 2018. H.I. testified that plaintiff was sometimes "dramatic," referring only to one occasion when plaintiff exaggerated the number of days her child had been constipated.

H.I. also testified that plaintiff never confided in her that defendant physically abused her. On cross-examination, H.I. admitted that she did not share with plaintiff, or anyone, the troubles that arose in her marriage. H.I. also admitted that she was not present on any of the occasions on which plaintiff alleged she was physically abused by defendant. In addition, although H.I. testified she was unaware of any domestic abuse in the Sudanese community, later testimony revealed that H.I. was the victim of domestic abuse.

The trial court issued an oral opinion denying plaintiff's application for an FRO, concluding she did not establish by a preponderance of the evidence "that there was assault, or terroristic threats, or harassment by" defendant. In reaching

7

this conclusion the court did not discuss the statutory elements of the alleged predicate acts of domestic violence. Nor did the court make an explicit credibility finding with respect to plaintiff. Instead, the court observed:

> As to whether the plaintiff was subjected to any pushing or shoving or choking, having listened to the testimony, having observed the plaintiff as she was giving the testimony, recalling at least two occasions where plaintiff testified that she initially thought the defendant was joking, it's peculiar to mesh that she thought the defendant was joking when someone is putting their hands around your neck – either you're scared or you're not.
>
> There was another occasion that the plaintiff testified that she asked the defendant for diapers and juice, and that he said okay, and then slapped me on my cheek, I thought he was joking. And then he slapped me again and I realized that he was not joking. That says to me, my interpretation of that is for someone to say okay and then to slap you, would present someone who's totally irrational. My observation of [defendant] does not lead me to believe that he is totally irrational. And for plaintiff to testify that, initially, she thought he was joking is peculiar that if someone slapped you at any point, that you would think that they were joking. That is a very peculiar description of the thought processes that you would think someone was joking.

In addition, the court observed that plaintiff did not disclose defendant's abuse to H.I., his close friend and coworker:

> It's reasonable to believe that a plaintiff wouldn't want to advertise that they are the victim of domestic violence, that they're not going to tell it to everyone.

8

> And that they would be selective as to who they did tell, if they told anyone at all. But in the three months that you were actually living with [H.I.], 24/7 as she states, for you not to say anything to her about it, for her not to see anything at all, for the two of you to have [sic] any kind of conversation about it if there's something that happened, rings a little peculiar and odd.
>
> And then to readily confide in someone – actually, a total stranger, a neighbor . . . also seems peculiar. That is not a judgment or a criticism. People get to choose who they want to confide in for sure. But in this situation, it just does not sound plausible.

Finally, the court suggested, without making a finding, that plaintiff may have sought an FRO to secure an unspecified advantage with respect to her immigration status. Testimony at trial established that when plaintiff came to the United States in March 2018 she had a visa that expired in August 2018. In addition, plaintiff had an appointment scheduled for August 2018 at the embassy in Khartoum to extend her visa. Plaintiff testified that defendant urged her to return to Sudan for the appointment, but refused to allow her to take their child, who is a citizen of the United States. Plaintiff refused to leave the country without her child, fearing defendant would refuse to permit her to leave Sudan, as would be his right under Sudanese law. The court observed that:

> I don't know, and I'm not going to say that I know, that the point or purpose of this filing of the restraining order was related to immigration. But I can't overlook the timeline that the visa ran out in August, that

[plaintiff] did not keep her appointment at the embassy in Sudan in August, and that she decided to file in September, two weeks after the allegations for August 25th. I have to say that it crosses my mind that perhaps missing the appointment at the embassy and the visa running out may have had some influence.[3]

The court made no credibility determination with respect to defendant. The court noted only that defendant appeared to have a bond with his child during their interactions before the court at trial.

On March 12, 2019, the court entered an order denying an FRO, dismissing the complaint, and vacating the TRO.

This appeal followed. Plaintiff raises the following arguments.

POINT I

THE TRIAL COURT ERRED BY IMPROPERLY APPLYING THE PREVENTION OF DOMESTIC VIOLENCE ACT WHEN IT DENIED THE FINAL RESTRAINING ORDER BECAUSE PLAINTIFF DID NOT TELL A SPECIFIC PERSON ABOUT THE ABUSE AND IGNORED TESTIMONY FROM A WITNESS.

[3] Earlier it its opinion, the court found that defendant gave plaintiff a roundtrip plane ticket to go to Khartoum for the August 2018 appointment. However, plaintiff's counsel pointed out that no such ticket (or any ticket) had been admitted into evidence and that the only testimony concerning a plane ticket was that plaintiff had flown to the United States in March 2018 on a roundtrip ticket that allowed her to return in August for the appointment. The court "set aside" its finding with respect to the roundtrip ticket and did not address whether the absence of a ticket back to the United States justified plaintiff's fear that defendant was attempting to strand her in Sudan without her child.

A-4174-18T3

[A.] THE TRIAL COURT IMPROPERLY DISREGARDED THE TESTIMONY OF PLAINTIFF'S WITNESS AND FAILED TO PROPERLY APPLY THE STATUTORY DEFINITION OF HARASSMENT TO THE PRESENT SITUATION.

POINT II

THE TRIAL COURT ERRED IN FAILING TO MAKE PROPER CREDIBILITY DETERMINATIONS REGARDING THE PARTIES AND IN IMPLICITLY REQUIRING PLAINTIFF PROVIDE INDEPENDENT CORROBORATION FOR HER ALLEGATIONS.

A. THE TRIAL COURT FAILED TO MAKE PROPER CREDIBILITY DETERMINATIONS.

B. THE TRIAL COURT'S IMPLICIT REQUIREMENT THAT PLAINTIFF CORROBORATE HER TESTIMONY WAS AN IMPROPER APPLICATION OF THE LAW.

POINT III

THE TRIAL COURT ERRED IN ITS APPLICATION OF THE DV [SIC] ACT TO PLAINTIFF'S ALLEGATIONS OF ASSAULT AND TERRORISTIC THREATS.

A. THE TRIAL COURT ERRED IN FINDING PLAINTIFF FAILED TO MEET HER BURDEN OF PROOF ON THE ALLEGATIONS OF ASSAULT AS SET FORTH IN THE COMPLAINT AND AMENDED TEMPORARY RESTRAINING ORDER.

11

B.   THE TRIAL COURT ERRED IN FINDING PLAINTIFF FAILED TO MEET HER BURDEN OF PROOF ON THE ALLEGATIONS OF TERRORISTIC THREATS AS SET FORTH IN THE COMPLAINT AND AMENDED TRO.

POINT IV

THE TRIAL COURT ERRED IN FINDING THERE WAS NO NEED TO PREVENT FURTHER ABUSE OF PLAINTIFF.

POINT V

THE TRIAL COURT ERRED IN FAILING TO PROVIDE PLAINTIFF WITH A COURT INTERPRETER THROUGHOUT THE ENTIRE PROCEEDING.

II.

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We should not disturb the "'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412

(alteration in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (citing Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

However, reversal is warranted when a trial court's findings are "so wide of the mark that a mistake must have been made." New Jersey Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). Likewise, "if the court ignores applicable standards, we are compelled to reverse and remand for further proceedings." Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008). Our review of a trial court's legal conclusions is always de novo. Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

The entry of an FRO requires the trial court to make certain findings. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The court should make this determination "'in

light of the previous history of violence between the parties.'" Ibid. (quoting Cesare, 154 N.J. at 402). If the court finds plaintiff did not establish predicate acts of domestic violence, it must dismiss the complaint. A.M.C. v. P.B., 447 N.J. Super. 402, 413 (App. Div. 2016).

If the court finds that plaintiff has proven a predicate act of domestic violence, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011). This determination requires evaluation of:

> (1)   The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2)   The existence of immediate danger to person or property;
>
> (3)   The financial circumstances of the plaintiff and defendant;
>
> (4)   The best interest of the victim and any child;
>
> (5)   In determining custody and parenting time the protection of the victim's safety; and

(6)  The existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a); see also Cesare, 154 N.J. at 401.]

Having carefully reviewed the record in light of these legal principles, we conclude the trial court erred in reaching its determination because it failed to make witness credibility findings, mischaracterized the testimony of A.E., and relied on irrelevant facts.

The testimony set forth conflicting accounts of the incidents plaintiff alleged were predicate acts of domestic violence.  Those accounts were provided by plaintiff and A.E. on the one hand, and defendant on the other.

Although it did not explicitly find plaintiff lacked credibility, the court appears to have rejected her testimony for two reasons.  First, the court found plaintiff's failure to disclose defendant's abusive behavior to H.I. to be "a little peculiar[,]" "odd[,]" and "not plausible."  Second, the trial court found plaintiff's testimony that on two occasions she thought defendant was joking when he initiated abusive behavior to be "peculiar" because "you're either scared or you're not."

We are not aware of any precedent requiring the victim of domestic violence to have disclosed the abuse to another in order to establish a predicate

act of domestic violence under the Act. Nor do we agree that a failure to disclose before seeking judicial relief casts doubt on the credibility of a claim of abuse. There are a number of reasons why a victim of domestic violence might be reluctant to disclose the abuser's behavior. Some of those reasons may well be applicable here. For example, cultural and religious norms may strongly discourage the disclosure of marital affairs. The record suggests the parties' close ties to the Sudanese Muslim community and culture may have influenced plaintiff not to disclose defendant's abuse. In addition, where the party alleging abuse is a new arrival to the country and dependent on the abuser for support and shelter, disclosure may be a difficult and risky proposition.

We note too that plaintiff may have had valid reasons not to disclose her abuse to H.I. It is undisputed that H.I. is a close friend of defendant. He took her to the hospital when she delivered her child and found it necessary to call the police for protection from her husband during a domestic violence incident. H.I. admitted that defendant pays her monthly cellphone bill. It is apparent that plaintiff may have feared that H.I. would have alerted defendant of any disclosure of abuse. In addition, defendant works for H.I.'s father driving a school bus. Plaintiff may have been concerned that disclosure of abuse to H.I. would affect his employment. Finally, most of the instances of alleged abuse

16

took place after plaintiff moved out of H.I.'s home. The record does not indicate plaintiff remained in close contact with H.I. after she moved out.

We note that the court found plaintiff's disclosure of defendant's abuse to a neighbor to be "peculiar" because she did not know her well. Despite having held that "[p]eople get to choose who they want to confide in for sure[,]" the court found plaintiff's choice of confidant undermined the credibility of her testimony. Thus, the court questioned the veracity of plaintiff's testimony both for not disclosing her abuse and for disclosing her abuse to the wrong person.

We also disagree with the proposition that plaintiff's testimony was undermined because on two occasions she thought defendant was joking when he initiated what she alleged turned into abusive behavior. The complaint does not allege defendant engaged in an uninterrupted campaign of physical abuse. It is not uncommon for a couple to have periods of relatively amicable relations between incidents of domestic violence. A domestic abuser's calm demeanor may suddenly turn violent. Plaintiff's testimony suggested that she and defendant sometimes engaged in playful physical interactions, stating that one incident of domestic abuse started when she tapped defendant on his behind. A victim of domestic violence need not prove that she was in constant fear to establish the predicate acts necessary for issuance of an FRO.

A-4174-18T3

The trial court made no express finding that defendant was credible. The court found only that he was not "totally irrational" and that he appeared to have a bond with his child during the trial. Defendant's relationship with his child is not relevant to his propensity for abusing his spouse. In addition, the court did not address whether in assessing the parties' testimony it considered the several instances during trial when defendant, who professed to rarely getting angry at plaintiff, yelled while testifying about her. Nor did the court address defendant's admission to having cursed at plaintiff in front of police officers at his home.

The court also erred when it found that A.E. "was not present at any time for any allegation that [plaintiff] made with regard to [defendant]. She didn't see anything herself that occurred between the two. She didn't hear anything herself that may have occurred between the two." A.E. testified that she was present when plaintiff retrieved her belongings from defendant's apartment and heard him call her vulgar names in Arabic that would subject her to isolation, ridicule, and shunning in the Sudanese community. Defendant admitted to cursing at plaintiff on that occasion. If found credible, A.E.'s testimony could well establish that defendant committed the predicate act of harassment. See N.J.S.A. 2C:33-4 ("a person commits [harassment] if, with the purpose to harass another, he . . . [m]akes, or causes to be made, a communication or

communications . . . in offensively course language, or any other manner likely to cause alarm . . . .").

We are also troubled by the trial court's reference to the timing of the filing of the complaint with relation to plaintiff's immigration status. Although the court made no specific findings, it is difficult to avoid the implication in the court's opinion that plaintiff may have filed a meritless complaint in order to remain in the country. The record, however, contains no evidence establishing the impact, if any, the filing of a domestic violence complaint has on the status of someone, like plaintiff, who has overstayed her visa. Without a more developed record on the subject, it was error for the court to imply that plaintiff's FRO application was unfounded and motivated by immigration concerns.

In light of these conclusions, we vacate the March 12, 2019 order and reinstate the complaint and the January 18, 2019 TRO. In light of the passage of time, we remand the matter for a new FRO trial rather than for new findings of fact and conclusions of law based on the existing record. The trial court may

19

amend the TRO as necessary to address developments since its entry. We do

not retain jurisdiction.[4]

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] We need not address plaintiff's argument regarding the courtroom interpreter. She alleges that while the interpreter translated the questions posed to her and her answers, she did not interpret the questions posed to, and answers given by, the other witnesses. During trial, plaintiff's counsel did not raise the issue. On remand, the trial court can address any requests made by the parties with respect to interpreting services.

A-4174-18T3