# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1467-24
A-1552-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

R.H. and W.H.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.H., N.H.,
and A.H., minors.

_____

Submitted October 23, 2025 – Decided October 31, 2025

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0009-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant R.H. in A-1467-24 (Louis W. Skinner, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant W.H. in A-1552-24 (Deric Wu, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Christopher Weber, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors A.H., N.H., and A.H. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In A-1467-24 and A-1552-24, which are consolidated for purposes of appeal, defendants R.H.[1] and W.H. appeal from a December 29, 2024 judgment terminating their parental rights to N.H. (Nick), A.H. (Andrea), and A.H. (Adam). We affirm.

In May 2019, the Division of Child Protection and Permanency (Division) received its first referral involving the parties when police contacted the

---

[1] We use initials and pseudonyms to identify the parties. R. 1:38-3(d).

Division due to concerns about the parents' homelessness. Nick was an infant at the time. The Division placed Nick with a relative.

On June 5, 2019, during a meeting with the parents, a Division caseworker smelled alcohol on W.H. and observed R.H. yelling at W.H., calling him "dumb and stupid." The Division held a family team meeting with the parents, and it was agreed the parents would seek public assistance and allow the Division to refer them for substance abuse and psychological assessments.

R.H. completed a substance abuse evaluation with a provider, who recommended her for intensive outpatient treatment (IOP) three times per week. R.H. missed her intake appointment, did not respond to the treatment facility's attempts to reach her, and was ultimately discharged for noncompliance on July 29, 2019.

W.H. attended his substance abuse assessment and tested positive for alcohol. He was diagnosed with mild alcohol use disorder and referred to outpatient treatment but did not comply with treatment and was discharged on August 20, 2019.

Both parents submitted to psychological evaluations. The evaluating doctor recommended R.H.: undergo a urine screen and treatment; take parenting classes; create a parenting plan; receive Division assistance to secure housing;

A-1467-24

and participate in therapy. The doctor recommended W.H. submit to: psychiatric and neurological evaluations for further diagnosis and treatment of his seizure disorder and other issues; IQ testing after six months of sobriety; parenting classes; and IOP mental health and substance abuse treatment. It was also recommended W.H.'s mental health "and substance abuse status . . . be clarified" before considering reunification.

In August 2019, the Division was concerned the relative resource and his partner were not providing Nick with medical care. As a result, and because R.H. and W.H. lacked housing and needed to engage in services, the Division filed a complaint for custody of Nick. After the court granted the Division custody, it placed Nick in a non-relative resource home where he has been since.

The Division facilitated biweekly supervised visits for the parents with Nick. The parents sporadically attended and sometimes requested they end early. During visits, the Division became concerned about R.H.'s parenting capacity and engagement with Nick because she exhibited aggressive behaviors, complained when she had to change his diaper, and put him down when he cried. W.H. was more attentive to Nick and seemed to exhibit good parenting skills.

In December 2019, the Division arranged parenting classes for the parents, which they initially attended and then stopped in January 2020. The Division

referred R.H. for a substance abuse evaluation and women's addiction services program. She completed both.

On September 12, 2019, the Union County Board of Social Services contacted the Division and stated the parents would be placed at the Elizabeth YMCA, and if an apartment was found, welfare would pay the security deposit and help furnish it. On October 1, 2019, W.H. advised the Division he was waitlisted for housing at the Woodbridge Housing Authority, and he and R.H. were continuously looking for affordable housing but could not find any.

The Division referred W.H. for a substance abuse evaluation, which recommended he engage in IOP. On October 30, 2019, while in treatment, W.H. tested positive for alcohol and did not comply with the recommended detoxification program. In December 2019, R.H. was arrested for assaulting W.H.

After the onset of the COVID-19 pandemic, the Division provided the parents with computers to facilitate virtual visits, but they did not comply. In-person visitation ultimately resumed in July 2020.

On March 30, 2020, the Division learned R.H. was three months pregnant with Andrea. In April 2020, it referred both parents for parenting classes and substance abuse treatment services, and R.H. for anger management services.

A-1467-24

The parents were provided with housing resources. Both parents missed multiple parenting classes, and when R.H. did attend, she was angry, frustrated, and difficult to work with.

In May 2020, after a Division referral, a program that assists unhoused people struggling with mental illness found R.H. ineligible because she did not have a severe mental health issue. R.H. did not meet the program's criteria since "[a]djustment [r]eaction with depressed and angry mood is not a [severe] and persistent mental illness." According to the provider:

> What stood out . . . in the evaluation is that if [R.H.] was dealing with severe and persistent mental health [issues] she would not be deemed competent enough by social security to be [W.H.'s] representative payee, which . . . she is, also she would have history of hospitalizations due to not caring for her mental health.

Nonetheless, the provider recommended housing services to R.H. In July 2020, Essex County social services placed the parents in a hotel, where they remained until May 2023.

On June 19, 2020, the parents underwent another psychological evaluation conducted by Dr. Alison Strasser Winston. R.H.'s diagnostic impressions included: unspecified personality disorder; unspecified bipolar and related disorder; mild cannabis use disorder in early remission; encounter for mental health services for perpetrator of parental child neglect; homelessness; and low

6

income. R.H. was "guarded" and "inconsistently cooperative." She was employed, and W.H. received Supplemental Security Income (SSI). Although R.H. acknowledged her anger issues, she denied being easily angered or physically aggressive.

Psychological testing of R.H. showed she had a "minimal degree" of emotional attachment to Nick and lacked the requisite knowledge to meet his emotional and physical needs. She became angry during the assessments, cursed, yelled, and banged on the table. Her scores were within the range of someone who had no parenting training.

Dr. Winston was concerned about R.H.'s history of homelessness and anger issues. She recommended R.H. undergo co-occurrent mental health and substance abuse treatment, individual psychotherapy, a psychiatric evaluation, anger management classes, parenting classes, and re-engage in substance abuse treatment.

W.H. was "guarded and minimally responsive." He insisted he did not drink alcohol and did not understand why he had tested positive for it in prior evaluations. W.H. described a history of epilepsy but was not medicated for it. He received SSI payments for a medical condition; his work history was minimal; and he was previously incarcerated for selling illicit substances.

A-1467-24

Although W.H. had an "adequate degree of emotional attachment" to Nick, he had extensive parenting deficits and did not have "concrete plans . . . to support the children[ or] provide for their needs." His personality assessment results were invalid. On the parenting assessment, he scored generally below average in comparison to other adults who did not have parenting training, and his score showed a high risk for inappropriate expectations, low level of empathy, and reverse family roles. W.H.'s diagnostic impressions were: encounter for mental health services for perpetrator of parental-child neglect; unspecified adjustment disorder; homelessness; low income; and mild alcohol dependence. He was recommended to participate in individual psychotherapy, parenting classes, anger management counseling, and substance abuse treatment.

Dr. Winston found both parents "lack[ed] the knowledge base to appropriately provide for [their] children's emotional and physical needs," and W.H. presented with "multiple factors that would impair his ability to safely" parent. She advised against reunification with Nick and recommended the Division remove Andrea when she was born.

On August 12, 2020, the court approved the Division's permanency plan for reunification and found the parents required more time to benefit from

services.  R.H. gave birth to Andrea less than a month later.  The hospital contacted the Division to report R.H. was not engaging with Andrea, and W.H. required redirection after he attempted to feed the baby with an old bottle.  The Division was granted custody of Andrea shortly after her birth and placed her in the same resource home as Nick, where she remains.

Around September 2020, R.H. was referred to outpatient treatment.  While in the program, R.H. was disrespectful to staff, refused to engage, and missed appointments.  She claimed she could not participate in virtual services and was discharged from the program on December 15, 2020.  R.H. told the Division she did not attend treatment because she did not have a substance abuse issue.

W.H. submitted to an intake appointment and was recommended for alcohol abuse treatment.  Despite this, R.H. claimed W.H. continued to drink.  As a result of ongoing concerns with W.H.'s alcohol use, the Division referred him for a substance abuse evaluation, which he did not attend.

In October 2020, the parents submitted to psychiatric evaluations.  R.H. was recommended for intellectual and cognitive testing, as well as psychiatric treatment for her marked irritability.  W.H. was recommended for an IQ assessment to establish a baseline for his cognitive functioning.  The assessment found W.H. had good memory and concentration, but limited insight into his

A-1467-24

current problems and below-average intelligence. Although W.H. had no mental illness, he had "intellectual limitations," which affected his problem-solving and reasoning skills.

The Division referred the parents to a program for individual therapy, and anger management services for R.H. In December 2020, the program dismissed W.H. after he missed three appointments. R.H. stopped attending appointments in December 2020 and was discharged for noncompliance in January 2021.

The Division organized supervised visits at its office for the parents with Nick and Andrea, but they missed multiple visits. W.H. claimed he missed the December 2020 visits because R.H. "did not want to go," he lacked transportation, and he did not have a phone number to confirm the visits. Thereafter, the Division made repeated attempts to assist him to confirm or reschedule visits, but W.H. continued to report he could not attend or was unsure whether he would attend. The Division was concerned W.H. was under the influence because his speech was incoherent and his demeanor hostile during calls.

In January 2021, the Division conducted searches via "Facebook, . . . mail, email, text messages, phone calls, and even in[-]person" for relative placements. Despite identifying several family members, the Division ruled them out due to

A-1467-24

inadequate housing, age, medical conditions, and disinterest. W.H. resisted relative placements outside of New Jersey, and R.H. told the Division it could do whatever it wanted with the children because she could always have more.

In March 2021, W.H. successfully completed an outpatient substance abuse program. The court granted the Division's request for eighty-hour alcohol screens over concerns he was still drinking, but he did not comply. That month, W.H. submitted to a neuro-psychological evaluation. He denied alcohol abuse issues or a criminal history, and claimed he was attending group meetings but could not recall where. The evaluation found W.H. had poor insight, "borderline range of intelligence," "poor computational skills," and "limited reading skills." W.H. was not "capable of providing independent, appropriate, and safe care to his children," and was recommended to undergo a neurological assessment.

R.H. failed to stay in regular contact with the Division and did not provide her phone number. In February 2021, she advised she did not want services. She was instructed to contact the Division if she wanted to re-engage. On March 18, 2021, a Division caseworker asked R.H. why she had not visited the children since February 11, 2021. She claimed she was tired because of work and declined additional visitation.

11

The Division changed its plan from reunification to termination of parental rights followed by adoption by the resource home. On April 22, 2021, the court approved the Division's plan, citing the parents' non-compliance with services, concerns over their mental health and substance abuse, and lack of stable housing.

On April 30, 2021, the Division again referred the parents to parenting classes, including observed visitations. W.H. continued to visit the children, often without R.H., though his attendance was inconsistent. The parents advised they no longer lived together consistently, and their relationship was unsteady and rife with disagreements.

In May 2021, the Division informed R.H. she needed to regularly participate in visitation and services, including therapy, parenting skills classes, and substance abuse. R.H. told a caseworker she did not want visitation and did not care about the children anymore. In early July, she informed the Division she had blocked the parenting skills worker's number and did not complete her observations.

The Division referred R.H. to intervention specialists who recommended she complete an IOP program and undergo a psychiatric evaluation. R.H. submitted to the psychiatric evaluation, which reported the following diagnostic

12

impressions: cannabis use disorder in early remission; chronic adjustment disorder with mixed disturbance of mood and conduct; likely dramatic cluster traits; unable to rule out intellectual/developmental limitations versus disability; Division involvement/loss of custody of her children; homelessness; and death of her sister who was her primary support. The evaluation recommended she continue her current treatment plan, medication management, and supportive therapy.

The Division filed a guardianship complaint on May 25, 2021. It referred R.H. for substance abuse treatment. R.H. admitted to recent marijuana use and attended IOP in May 2021. On July 8, 2021, she was discharged for noncompliance because she was "emotionally dysregulated" and verbally assaultive. She was recommended to engage in mental health services.

In July 2021, R.H. was arrested and charged with simple assault of W.H. The Division referred W.H. for domestic violence services, but he declined.

On September 7, 2021, R.H. underwent psychological and bonding evaluations. Testing revealed she had intellectual limitations with a general IQ score of fifty-five, falling in the borderline intellectual range. She read at an eighth-grade level, struggling particularly in word comprehension. R.H. suffered from sleep difficulties related to her nighttime employment and showed

minimal signs of depression. Notably, there were reliability concerns with multiple assessments due to her inconsistent responses, possibly attributed to her reading difficulties, confusion, malingering, defensiveness, or carelessness.

During the bonding evaluation, R.H. admitted she did not visit the children frequently because of her work schedule. The evaluator found R.H. "display[ed] an inability to appropriately interact with her children or . . . demonstrate affection to them," and the children were "securely attached and bonded to their resource parent." The bonding evaluation concluded reunification was not possible, kinship legal guardianship (KLG) was not a satisfactory permanency plan, and adoption by the resource parent was in the children's best interests. W.H. was also scheduled for psychological and bonding evaluations, but did not attend.

In October 2021, the Division assisted the parents with obtaining a new bank card and having W.H.'s SSI reinstated. In December 2021, R.H. was scheduled to start virtual psychotherapy, but was terminated within days of being accepted into the program for verbally abusing and threatening staff. She was also terminated by the parenting skills provider for the same reason. That provider recommended she receive a higher level of treatment to stabilize her behavior before she continued with its service. The Division also referred W.H.

to the same provider for parenting and individual counseling. It also inquired again with the housing services provider, but R.H. remained ineligible for admission to the program.

In December 2021, the Division discussed adoption and KLG with the children's resource parent. She continued to prefer adoption.

In January 2022, a Division supervisor had a challenging time completing Division of Developmental Disability (DDD) applications for the parents due to their lack of cooperation. W.H. told his caseworker he enjoyed his first session with DDD, but the number of services he was required to attend caused him "so much stress."

Although the termination trial was scheduled for January 2022, the court adjourned it so the parents could have more "time to take advantage of services." The court ordered the Division to determine R.H.'s "disposition prior to the children's arrival for a safe visitation."

The Division referred the parents to a psychoeducational service for dialectical behavior therapy, anger management, parenting, and individual counseling. R.H. only attended four of her thirteen individual counseling sessions, and while she attended her other weekly virtual sessions, she did not actively participate and either kept her camera off or pointed at the ceiling.

15

Despite having separately scheduled therapy appointments, on more than one occasion, R.H. attended W.H.'s sessions, spoke and answered questions for him, and cursed at staff. In March 2022, R.H. was discharged for threatening and cursing at staff. W.H. was also terminated from the program due to concerns R.H. would interfere with his sessions.

As of February 2022, W.H. still had not completed the court-ordered eighty-hour alcohol test. On February 14, 2022, he submitted to a neurological assessment, but did not complete the additional electroencephalography testing. The Division referred R.H. for a neuropsychological evaluation, but she did not attend any of the three scheduled appointments.

In March 2022, the parents began therapeutic visitation and parenting skills training services. Their attendance was inconsistent. When R.H. did attend, she often complained when she had to change diapers. R.H. played with the children during some visits, was able to direct the children to clean up, and reportedly laughed and smiled at times. However, R.H. and Nick "had a difficult time interacting and were unresponsive to [s]taff's prompts to engage with each other." Within a few months, both parents were discharged after missing several visits, and visitation resumed in the Division's office.

A-1467-24

In March 2022, W.H. called police, alleging R.H. assaulted him, threw food, and refused to leave. R.H. admitted attacking W.H. and was arrested. On May 26, 2022, W.H. pled guilty to a contempt charge, was placed on probation, and ordered to comply with substance abuse treatment.

After a multi-day permanency hearing conducted between May and September 2022, the court denied the Division's permanency plan of termination of parental rights, dismissed the guardianship complaint, and re-opened the protective services litigation under the FN docket. The court again reasoned the parents needed more time to receive proper services.

In June 2022, the parents were assigned to a program, which supports DDD clients in obtaining community-based services to assist with housing and other tasks, including applying for jobs and grocery shopping. The program repeatedly assigned new workers to the parents because of R.H.'s inappropriate behaviors, and considered closing their case, but the Division advocated to keep it open.

R.H. gave birth to Adam in August 2022. The hospital contacted the Division to report concerns R.H. was incapable of caring for the child. The Division caseworker met with the parents and reportedly smelled alcohol on W.H.'s breath, but he denied drinking. The Division was granted custody of

17

Adam due to continued concerns over the parents' compliance with services and housing stability. Nick and Andrea's resource parent was unable to care for Adam, so he was placed in a different non-relative resource home with a married couple, where he has remained.

R.H. re-engaged in services after Adam's birth. In September 2022, she completed assessment packets for the DDD support program provider and participated in family team meetings. In October 2022, the parents participated in parenting classes. A November 19, 2022 progress report indicated R.H. had "shown to be [willing] to engage in the parenting skills group." In or around December 2022, both parents successfully completed parenting classes.

Beginning in October 2022, the Division arranged for the parents to attend therapeutic visitations and a parenting skills program. Their attendance was sporadic, even though the Division arranged transportation.

At his visits, W.H. demonstrated "more compassion, . . . affection, [and] patience" than R.H. and was "more receptive to the children's needs," but would also become overwhelmed. He comforted the children, played with and read to them, changed diapers, and cleaned up after them. The Division noted visits were "going well." A caseworker observed W.H. was "very natural" with the children, would hug them, and was particularly close with Andrea. He was "very

affectionate," willing to change diapers unprompted, and had "fairly good behaviors." However, W.H.'s plan was to parent with R.H.

During November 2022, W.H. was compliant with services, though he found it challenging to attend visits due to the number of services required of him. In December 2022, he was non-compliant with services but had started a new job and was reporting regularly to his probation officer.

R.H. also attended visits with the children. However, she lacked "patience and affection towards the children." The staff supervising the visits were concerned about R.H.'s behaviors, including: cursing and yelling at staff in the presence of the children; complaining about visiting the children; and telling Adam to "shut-up" as he cried. The children cried and frequently ran from R.H. to the caseworker or the program's staff.

R.H. agreed to attend services with the DDD provider beginning in December 2022. However, the provider had difficulty finding someone who could accommodate her work schedule. R.H. never began services because she did not complete the necessary paperwork.

On November 29, 2022, the court approved the Division's plan of termination of parental rights followed by adoption because of the parents' lack of stable housing, R.H.'s refusal to comply with recommended services, W.H.'s

inability to parent independently, and concerns over the parents' cognitive issues. The Division filed a complaint for guardianship of Nick and Andrea on January 13, 2023.

During a visit on February 14, 2023, R.H. yelled at staff in front of the children after they asked her to sign early intervention forms for Adam. Security escorted R.H. from the visit after she threatened to "beat" the visitation supervisor. A few days later, at another visit, R.H. again yelled and threatened the supervisor. The children witnessed her behavior and began crying. Security escorted R.H. outside the building, where she stood and screamed threats for approximately forty-five minutes. Her behavior caused staff to feel unsafe, requiring security to escort them to their cars. W.H. was allowed to continue with the visit, despite R.H.'s behavior.

After these incidents, the provider terminated the parents' visitation because they were harmful for the children. On March 6, 2023, the court suspended R.H.'s visitation. R.H. expressed relief she no longer had to attend the visits; her last visit took place on February 16, 2023. The Division continued to assess relatives for possible placement of the children.

In February 2023, the Division documented W.H. was consistently testing negative on his substance abuse screens and would have his probation case

A-1467-24

closed in May 2023. W.H.'s visits with the children became sporadic, stopping altogether in September 2023.

In May 2023, the parents lost their temporary housing at a hotel. In response, the Division transported them to social services, where it learned they had filed jointly and were deemed ineligible for housing assistance because of W.H.'s SSI and R.H.'s unemployment compensation. The Division encouraged them to file separately. The parents' housing struggles continued into the fall of 2023.

In June 2023, R.H., W.H., and the children's respective resource parents underwent bonding evaluations with Dr. Frank Dyer. R.H. also submitted to a psychological evaluation, but W.H. declined to submit to his psychological evaluation.

Dr. Dyer found R.H. was "not hostile or aggressive," "not very defensive," and "cooperative." She had some cognitive limitations, did not know Adam's age, and paused before providing Nick's age. R.H. denied having psychological or substance abuse issues. Although she no longer attended court and disliked the Division, she was still interested in reunification and planned to take the children to the pool, out to eat, and wanted to have fun with them. R.H. could not fully explain what services the children were receiving, but knew Adam was

21

referred for early intervention, and Nick was diagnosed with attention deficit hyperactivity disorder (ADHD) and received therapy. She admitted assaulting W.H. but minimized her conduct.

Testing showed R.H. had mild cognitive impairment, could not read on a functional level, which suggested neurological impairment or intellectual deficiency, and her cognitive and intellectual disabilities were worsened by her personality attributes. The diagnostic impressions were: cannabis and alcohol disorders, with remission status unclear; mild intellectual disability; and personality disorder not otherwise specified, with borderline and antisocial features.

Dr. Dyer noted W.H. appeared to be more appropriate with the children than R.H., and "show[ed] affection and basic parenting skills." R.H. was "entirely appropriate . . . in th[e] initial phase," interacted appropriately, and was "pretty good" at supervising all three children. Nick and Andrea understood R.H. and W.H. were their mother and father. However, neither child "displayed any true excitement, enthusiasm, or strong affectionate tie toward either [parent]," but "appeared to enjoy interacting with their birth parents."

Adam's resource parents stated he was their only child. He received physical therapy and early intervention services. Nick and Andrea's resource

A-1467-24

parent stated: Nick had asthma, ADHD, and required different therapies; and Andrea received speech therapy. There was a significant affection between Nick and Andrea and the resource parent.

Dr. Dyer concluded R.H. was not a viable candidate for reunification due to her inability to engage appropriately in services, poor compliance, and risk of substance abuse and homelessness. He concluded the parents' continued and contentious relationship as a couple would "absolutely preclude" W.H. from successfully parenting the children.

In July 2023, the Division explained the differences between KLG and adoption to Adam's resource mother, who gave several reasons why she wanted to adopt. The Division amended the guardianship complaint to include Adam on January 24, 2024.

Judge Rosalba L. Comas conducted a four-day trial in March and April 2025. Although the Division offered the parents transportation to the trial, W.H. only attended the first day and R.H. did not attend at all. The Division presented the testimony of: its permanency caseworker, a caseworker supervisor, and an adoption worker; psychological experts, Drs. Winston and Dyer; Adam's resource parent; Nick and Andrea's resource parent; and the DDD provider's

23

assistant director of support communication. The judge admitted 196 exhibits into evidence and issued a detailed written opinion.

The Division workers' testimony set forth the facts we outlined above, including: the services provided to the parents; their compliance or lack thereof; the Division's attempts to locate relative placements; and its discussions with the resource parents regarding KLG and adoption. The judge found the testimony of the Division employees and the DDD program director credible.

Adam's resource parent testified he had been in her care since August 2022. She advocated for him to receive early intervention services, though he was initially deemed ineligible. Adam lived with his resource parents and another infant foster child, who was recently placed in the home. The children's respective resource parents maintained contact between the siblings and intended to do so after adoption. She confirmed the Division explained the difference between KLG and adoption, and she remained committed to adoption. She did not want the parents to be able to make decisions for the children.

The judge found Adam's resource parent credible. She observed how she had "provided heartwarming testimony regarding [Adam] and how he is considered a son, grandson, and nephew by the entire family. [The resource

parent] gave specific testimony about his needs and . . . progress with the services being provided."

Nick and Andrea's resource parent testified Nick had been with her since August 2019, and Andrea since September 2020. Nick received developmental intervention services, occupational therapy, and physical therapy, which she personally continued during the COVID-19 pandemic. Nick was four-and-a half-years old, not fully potty-trained, and diagnosed with autism and ADHD. Aside from early speech therapy, Andrea did not receive services. The children lived with the resource parent, her biological children, and the resource parent's mother, who was described as a "grandma" to the children. Like Adam's resource parent, she testified she knew the difference between KLG and adoption, and was committed to adoption and supporting ongoing sibling contact with Adam following adoption.

Nick and Andrea's resource parent also discussed how she attempted to involve the parents and other relatives of the children. R.H. ignored her calls, and although she had spoken on the phone with W.H., neither parent acknowledged photos she sent them of the children. She invited the parents to meet with her without Division involvement, but both refused. Her attempts to

engage with the paternal grandmother and another relative were unsuccessful as neither contacted her.

The trial judge found Nick and Andrea's resource parent credible. "She gave great insight about each child, their similarities and differences[,] and their relationship. . . . [S]he provided detailed testimony about [Nick's] special needs, services provided[,] and ongoing progress showing her knowledge and commitment to [his] ability to thrive in the future."

Dr. Winston opined the parents' poor judgment, lack of parenting skills, anger management issues, domestic violence, and W.H.'s alcohol use did not support reunification. The judge found her to be "a highly credible witness."

Dr. Dyer testified R.H. posed a significant risk of harm to the children due to her history of verbal abuse "coupled with her mild cognitive impairment," anger management issues, emotional instability, poor impulse control, negativism, and lack of insight. Nick's "vulnerabilities" made it "urgent for him to have permanency." It was important for Andrea to achieve permanency because she was at risk of "very serious emotional consequences" if removed from her resource parent to whom she was attached. Adam was "profoundly" attached to his resource parents and separating him from them would cause him a "catastrophic loss."

Dr. Dyer further opined, it would be harmful for the children to delay permanency given R.H.'s inability to adequately parent. A termination of parental rights would not harm the children, but they would suffer a risk of harm if separated from their respective resource parents. The optimal result for the children was adoption by their resource parents. The judge found Dr. Dyer was "a highly credible witness."

The judge concluded the Division had clearly and convincingly proven all four prongs of the best interests standards under N.J.S.A. 30:4C-15.1(a). She addressed prongs one and two together.

The judge found the parents harmed the children because of their "unaddressed . . . mental health, parenting deficits, substance abuse, domestic violence, [un]stable housing, and [inability to] provid[e for their] basic needs." She concluded the parents were unable or unwilling to alleviate these issues and although "given repeated and extensive opportunities and efforts . . . , [they] continued to harm the children. Both parents [were] unsuccessful in engaging in, complying with[,] or gaining any benefit from services provided."

The parents' "lack of commitment . . . evidence[d] a continuing clear and present danger to the children's health, safety[,] and welfare." The children were "involved with the Division for much of their lives[,] . . . [and t]he consequence

27

for the[m] has been an unstable and uncertain existence." The uncertainty and the parents' continued inaction would "have a continuing and destructive effect on the children." Moreover, "the parents' lack of engagement with the children [constituted] a withdrawal of solicitude, nurtur[ance], and care . . . that persisted for an extended period of time and thereby harmed the children further."

The judge credited and discussed in detail the unrebutted expert testimony, which showed neither parent was capable of safely caring for the children. Based on the testimony, she had no doubt the parents were in the same position as they were when Nick was removed. "Despite the Division's extensive reasonable efforts, spanning a significant amount of time, both parents . . . failed to consistently, meaningfully[,] and fully take advantage of the multitude of services offered . . . by the Division." The parents' unwillingness to do so "directly contributed to their inability to care for the children and further demonstrate[d] an inability to provide the stability . . . the children need and rightfully deserve." They lacked the capacity to parent "either together or independently," and there was "no realistic likelihood . . . either parent [would] be able to parent the children any time in the near future." Neither parent could provide the children with "a safe, stable[,] and healthy home."

The judge found the Division proved the third best interests prong because there was no dispute it "engaged in extensive and numerous efforts to provide a myriad of services to both" parents to reunify the family. She recounted the litany of services discussed in the documentary evidence and testified to by the Division caseworkers and the DDD provider's representative. The uncontroverted evidence showed "the Division's efforts to have each parent engage in services was continuous and extensive."

The judge rejected R.H.'s argument the Division failed to provide her with the proper or specific services to address her intellectual disability. DDD "assist[ed] both parents in their housing efforts based on the parents' specific disability needs. Further, [the caseworkers] testified about their efforts to work with both parents by either repeating information, breaking down tasks[,] or writing down plans for them to follow."

The judge rejected W.H.'s argument he complied with services. Although he initially engaged with substance abuse treatment, "he failed to follow up with the recommended after care programs necessary to keep him sober."

The judge concluded the Division met the third best interests prong because its "services were specifically catered to address the parents' disabilities." However, "neither parent followed through completely [n]or even

29

benefitted from the services they attended as the problems persisted and were never resolved."

The third best interests prong was also proven because the record "strongly support[ed]" the resource parents' "fully informed commitment to adoption after being advised of and understanding the differences between KLG and adoption." Indeed, Adam's resource parent explained the discussions she had with the Division regarding the differences between KLG and adoption, "consulted with her husband," and "was specific in her testimony about her understanding of the differences between the two plans." She understood KLG meant a possibility Adam would be returned to his parents, but considered him "part of her family[,] and . . . wished to make it legal." Nick and Andrea's resource parent testified about "the various reasons . . . she wanted to adopt instead of pursuing KLG." She did not want the parents to regain custody of the children or for "the children to go through that experience," and wanted to plan for the children's care in the event of her demise.

The judge found the Division proved the fourth best interests prong because neither parent could address the "assortment of issues" facing them as they failed "to engage in services, . . . stay the course with services[,] or . . . gain any benefit from the services received." R.H. was "caught in a vortex of mental

30

health issues that impacts every facet of her life [and] . . . prohibits her from obtaining any kind of necessary treatment in order to maintain a safe and stable environment for the children." The judge concluded the only way to ensure the children's safe and healthy future was by letting them remain with their resource parents.

The children were bonded with their resource parents. Nick lived with the resource parent since three-and-a-half months of age and knew her as his mother. The same was true for Andrea, who was placed with the resource parent at two days old. The children were inseparable from one another, the resource parent, and her extended family. The judge also credited the resource parent's testimony regarding her efforts to address Nick's special needs and her advocacy on his behalf to ensure he received necessary services. As a result of her efforts, Nick was progressing and thriving in school. The judge observed the resource parent exerted the same effort for Andrea, who was progressing in school and socially.

Adam lived with his resource parent since he was three days old. The evidence showed he was a special member of her family. Extended family even traveled from abroad to celebrate his first birthday. Adam's resource parent also advocated for him and addressed his physical, speech, and developmental needs.

31

The judge credited the Division workers' testimonies, which corroborated the resource parents' testimonies about the bond between them and the children. The expert testimony further substantiated there was no evidence of a bond between the biological parents and the children, and separating the children from their resource parents would cause each child to suffer.

The judge concluded neither parent could care for the children in the foreseeable future. There was "no evidence in the record . . . any harm will occur to any of the children" if parental rights were terminated. The children would suffer harm if returned to either parent, and it was contrary to their best interests to delay permanency any longer.

I.

Both parents challenge the judge's findings under each best interests prong. They claim there was no evidence they harmed the children to support a finding under the first prong. The only evidence of harm was the unsupported hypotheses of the experts.

As for the second prong, R.H. argues it was error to conclude she was unwilling or unable to correct the harm. She was willing to engage in services and claims the trial judge ignored the evidence showing her attempts to comply with services, struggles with employment, and mental health problems. R.H.

32

asserts the Division should have advocated for a guardian ad litem (GAL) to assist the court in understanding her mental competency. W.H. contends he too was willing to remedy the harm because he complied with services, but the numerous services created an unreasonable burden, which prevented him from achieving reunification.

R.H. argues the third prong was not proven because the Division did not help her find housing and merely referred her to service providers without considering her limitations. The judge also erred because she did not "consider KLG as an obvious available alternative to [the] termination of [her] parental rights in violation of" recent amendments to the law in 2021. Instead, the judge improperly prioritized the resource parents' adoption wishes.

W.H. claims the numerous services he received were not tailored to achieve reunification and instead, were designed to wear him down so he would eventually surrender his parental rights. For example, he alleges he did not suffer from a severe alcohol problem yet was recommended for an additional eighty hours of treatment. The Division also failed to support him parenting alone and blamed him for R.H.'s shortcomings. W.H. asserts the record shows he was a good parent. He argues the resource parents did not make an informed

33

decision about the difference between KLG and adoption because the Division provided them with biased information.

Both parents claim the fourth prong was not proven because termination of parental rights will do more harm than good. R.H. argues the trial judge's reliance on Dr. Dyer's testimony, the resource parents were better at parenting, was a mistaken application of law. W.H. asserts a termination of his parental rights has little value because it would destroy the children's only loving relationship with a biological parent.

## II.

The four-part best interests test, codified in N.J.S.A. 30:4C-15.1(a), is used by the court to strike a balance between a parent's constitutional rights and a child's fundamental needs. The Division must clearly and convincingly prove:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

34

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The best interests factors "are not discrete and separate, but relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

We must defer to a trial judge's factual findings unless they "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting Snyder Realty, Inc. v. BMW of N. Am., 233 N.J. Super. 65, 69 (App. Div.), certif. denied, 117 N.J. 165 (1989)). So long as "they are 'supported by adequate, substantial and credible evidence,'" a trial judge's factual findings will not be disturbed on appeal. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). We owe special deference to the Family Part's expertise. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).

Pursuant to these principles and having considered the record, we conclude Judge Comas's findings were based on sufficient credible evidence and

her legal conclusions are beyond reproach. Her conclusion the termination of parental rights is in the children's best interests is amply supported by the record, and we affirm substantially for the reasons set forth in her comprehensive and well-written opinion. R. 2:11-3(e)(1)(A). We add the following comments.

We reject R.H.'s assertion the Division did not meet its reasonable efforts obligation under prong three because it did not advocate for the appointment of a GAL. The record does not support her contention she needed a GAL. If it did, it would only further prove she lacked the capacity to parent. Regardless, neither of the Division's experts testified R.H. was mentally incompetent. The record instead shows her parenting failures were due to her refusal to participate in, and complete, services. When she took advantage of services, she made it impossible for providers to help her due to her belligerence, not mental incompetence.

The remaining arguments raised in each appeal lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in A-1467-24 and A-1552-24.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1467-24